

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-5-2001

# Rosenberg v. XM Ventures

Precedential or Non-Precedential:

Docket 01-1484

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Rosenberg v. XM Ventures" (2001). *2001 Decisions.* Paper 284.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/284

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 5, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1484

ARON ROSENBERG,
　　　Appellant

v.

XM VENTURES, a Maryland trust; and
MOTIENT CORPORATION, a Delaware corporation

Appeal from the United States District Court
for the District of Delaware
(D.C. Civ. No. 00-cv-00528)
District Judge: Honorable Gregory M. Sleet

Submitted Under Third Circuit LAR 34.1(a)
September 10, 2001

Before: MANSMANN, RENDELL and ALDISERT,
Circuit Judges.

(Filed December 5, 2001)

　　　Jeffrey S. Goddess, Esquire
　　　Rosenthal, Monhait, Gross
　　　 & Goddess
　　　First Federal Plaza
　　　P.O. Box 1070
　　　Wilmington, DE 19899-1070

　　　Mitchell M. Twersky, Esquire
　　　Fruchter & Twersky
　　　60 East 42nd Street
　　　Suite 4700
　　　New York, NY 10165

Jeffrey S. Abraham, Esquire
Abraham & Paskowitz
60 East 42nd Street
Suite 4700
New York, NY 10165

 Counsel for Appellant

Timothy J. Finn, Esquire
Jones, Day, Reavis & Pogue
51 Louisiana Avenue, N.W.
Washignton, D.C. 20001

 Counsel for Appellee
XM Ventures

Jon E. Abramczyk, Esquire
Donna L. Culver, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

 Counsel for Appellee
Motient Corporation

OPINION OF THE COURT

MANSMANN, Circuit Judge.

I.

The appellant, Aron Rosenberg, is a shareholder of Motient corporation. He has appealed from a District Court judgment dismissing, with prejudice, his shareholder derivative action against XM Ventures for failing to state a claim upon which relief can be granted. The complaint asserted a violation of section 16(b) of the Securities and Exchange Act of 1934 resulting from XM Ventures' sale of Motient stock.

The issue on this appeal requires us to determine whether beneficial ownership of a subject issuer's equity securities is a necessary element of group membership

2

within the meaning of section 13(d)(3) of the Securities and Exchange Act of 1934. We conclude that it is. We have carefully considered the other issues presented by the Appellant and conclude that no extended discussion is necessary. As a result, we will affirm the Order of the District Court dismissing Rosenberg's Complaint. 1

The specific question before us is whether beneficial ownership of the equity securities of a corporate issuer by each group member is a necessary element for entrance in a section 13(d) group. Put another way, may an individual without beneficial ownership of the equity securities of an issuer become a member of a group consisting of individuals who are beneficial owners of the issuer's equity securities for the purpose of determining whether the group members are statutory insiders subject to section 16(b) of the Securities and Exchange Act of 1934?

II.

Plaintiff-Appellant Aron Rosenberg appeals from the District Court's grant of Defendant-Appellee XM Ventures' motion to dismiss pursuant to FED. R. C IV. P. 12(b)(6). We note from the outset that this case takes many twists and turns through the thicket of federal securities law. Therefore, we begin our trek, compass in hand, with the salient facts. Rosenberg is a shareholder of Motient, Inc. (Motient), a public company registered under section 12 of the Securities and Exchange Act of 1934. 15 U.S.C.S 78l (1994). Motient owned 80 percent of the outstanding shares of XM Satellite Radio Holdings, Inc. Another company, WorldSpace, Inc., owned the remaining shares of XM Holdings.

Rosenberg alleges that "in or about mid 1999, Motient, its significant shareholders, and WorldSpace agreed that

_____

1. The District Court properly had jurisdiction based on 15 U.S.C. S 78aa. We have jurisdiction based on 28 U.S.C. S 1291. Appeal was timely filed under FED. R. APP. P. 4(a). In addition, we exercise plenary review of a District Court's grant of a motion to dismiss under FED. R. CIV. P. 12(b)(6). Maio v. Aetna, Inc., 221 F.3d 472, 481 (3d Cir. 2000). Furthermore, we exercise plenary review over the interpretation of statutes. United States v. Schneider, 14 F.3d 876 (3d Cir. 1994).

Motient would purchase WorldSpace's 20 % interest in AMRC [XM Holdings]." See App. at 15. Further, Rosenberg alleges that "various agreements, formal and informal, entered into by and between, Motient, XM, WorldSpace and Motient's significant shareholders, created a group which acted together for the purpose of acquiring, holding or voting the Company's [Motient's] Equity securities . . . [and] at all relevant times, that group included XM and owned more than 10 percent of the Company's [Motient's] outstanding Common Stock." Id. at 16.

On June 7, 1999, Motient, XM Holdings, and WorldSpace entered into a formal Share Exchange Agreement. At bottom, the Agreement provided that WorldSpace would transfer all of its shares of XM Holdings to Motient in exchange for Motient's issuance of 8, 614, 244 shares of its own stock to an irrevocable grantor trust (XM Ventures) to be created by WorldSpace. The Agreement further provided that XM Ventures would transfer its XM Holdings stock to Motient; thereafter, Motient would issue its own stock to XM Ventures in two distributions. The transaction would result in XM Holdings being a wholly owned subsidiary of Motient, and XM Ventures, with the CEO of WorldSpace acting as trustee, would be a substantial shareholder of Motient.

According to Rosenberg, between September 1999 and February 2000, XM sold a portion of the Motient shares that it acquired under the Agreement. Rosenberg filed the present action, contending that XM must disgorge the profits it realized on these trades to Motient pursuant to section 16(b) of the Securities and Exchange Act of 1934. See 15 U.S.C. S 78p(b) (1994). In response to Rosenberg's complaint, XM filed a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6).

The District Court granted XM's motion to dismiss, with prejudice, partially on the ground that XM was not a member of a group that owned more than a 10 percent beneficial interest in Motient equity securities prior to XM's acquisition of Motient Stock. App. at 141. In opposing XM's motion to dismiss, Rosenberg argued, among other things, that WorldSpace acted as XM's agent because "it is reasonable to infer . . . that XM specifically requested that

4

the Group be formed to insure XM's acquisition of the additional shares." App. at 149. The District Court rejected this argument, concluding that "a critical flaw in this argument is the fact that WorldSpace, whether as principal or agent, could not have been a member of an ownership group prior to the purchase because it never owned any Motient stock prior to the transaction in question." Id. We write to clarify the District Court's conclusion on this point because it could be interpreted as requiring record ownership of an equity security as a prerequisite to membership in a section 13(d) group.

III.

To answer the question before us on this appeal properly, we are required to interpret provisions of the Securities and Exchange Act of 1934. 15 U.S.C. S 78a, et. seq. (1994). Therefore, we begin by briefly setting forth the general analytical framework underlying our construction of the provision at issue. The role of the courts in interpreting a statute is to give effect to Congress's intent. See Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998), citing Negonsott v. Samuels, 507 U.S. 99, 104 (1993). Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with an examination of the plain language of the statute. See id. at 202, citing, Santa Fe Med. Servs., Inc. v. Segal (In re Segal), 57 F.3d 342, 345 (3d Cir. 1995) (citing Mansell v. Mansell, 490 U.S. 581 (1989)); United States v. Pelullo, 14 F.3d 881, 903 (3d Cir. 1994). Where the statutory language is plain and unambiguous, further inquiry is not required. See In re Segal, 57 F.3d at 346. To determine whether the statutory language is ambiguous, we must examine "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." See Marshak v. Treadwell, 240 F.3d 184, 192-93 (3d. Cir. 2001), quoting, Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997). In addition, when interpreting a statute, courts should endeavor to give meaning to every word which Congress used and therefore should avoid an interpretation which renders an element of the language superfluous. See

5

United States v. State of Alaska, 521 U.S. 1 (1997), reh'g denied, 521 U.S. 1144 (1997); United Food & Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 550 (1996) (reading which gives effect to all of a statute's provisions prevails over one which disregards a provision as legislative oversight); First Bank Nat'l Ass'n v. FDIC, 79 F.3d 362, 367 (3d Cir. 1996). This precept of statutory construction applies to the interpretation of regulations as well. See Silverman v. Eastrich Multiple Investor Fund, LP, 51 F.3d 28, 31 (3d Cir. 1995) (court's construction should give effect to all provisions); LaVallee Northside Civic Ass'n v. Virgin Islands Coastal Zone Management Comm'n, 866 F.2d 616, 623 (3d Cir. 1989) (court should endeavor to reconcile conflicting statute and regulation). Thus, the preferred construction of a statute and its regulations is one that gives meaning to all provisions. See United States v. Higgins, 128 F.3d 138, 142 (3d Cir. 1997). With these principles in mind, we turn our attention to the Act.

A. Section 16(b) of the Securities and Exchange Act of 1934.

Before we begin our analysis, however, we will provide context by setting forth the statutory provision that gives rise to liability in this case. Section 16(b) of the Securities and Exchange Act of 1934 provides that any profit realized by a corporation's principal stockholders arising from the purchase and sale of a corporation's equity securities within a period of less than six months must be disgorged to the corporation. See 15 U.S.C. S 78p(b) (1994); Foremost-Mckesson, Inc. v. Provident Sec. Co., 423 U.S. 232 (1976). We mention in passing that we are not concerned with section 16(b) liability as it applies to corporate officers and directors. Here, we address section 16(b) liability specifically as it relates to the principal stockholders of a corporation in a purchase-sale sequence.

The principal stockholders of a corporation are those shareholders who directly or indirectly beneficially own more than ten percent of the corporation's equity securities. Gollust v. Mendell, 501 U.S. 115 (1991). From these precepts, it is clear that liability will attach under section 16(b) when an individual having beneficial ownership of

6

more than 10 percent of any one class of the issuer's equity securities both purchases and sells shares of the issuer within six months. See, e.g., Feder v. Frost 220 F.3d 29, 32 (2d Cir. 2000) quoting Gwozdzinsky v. Zell/Chilmark Fund, 156 F.3d 305, 308 (2d Cir. 1998). In other words, an individual will not be liable as a principal stockholder under section 16(b) for buying and selling stock within six months of each other unless prior to the purchase he beneficially owns more than ten percent of the equity securities of a corporation. Having explained when liability will attach to a beneficial owner of securities under section 16(b) for certain trading activity, we now turn to a discussion of exactly who can be a beneficial owner, within the meaning of section 16, of equity securities.

B. Beneficial Ownership of Equity Securities .

Section 16 of the Securities and Exchange Act of 1934 does not specifically define beneficial ownership with respect to determining the principal stockholders of a subject issuer. See 15 U.S.C. S 78p(a) (1994). Rather, the Securities and Exchange Commission (SEC), the agency authorized by Congress to implement the statute, promulgated rules in 1991 prescribing the contours of beneficial ownership under section 16 for the purpose of determining whether a person is a beneficial owner of more than 10 percent of a class of equity security. See Feder, 220 F.3d at 33, see also Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 34-28869, 56 Fed. Reg. 7242 (Feb. 21, 1991). The relevant rule states that "the term `beneficial owner' for purposes of section 16(b) shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the Securities and Exchange Act of 1934 and the rules thereunder." 17 C.F.R. S 240.16a-1(a)(1) (2000). In substance, the SEC merely engrafted section 13(d)'s definition of beneficial ownership onto section 16. We note here, however, that the term "beneficial owner" has another definition under Rule 16a-1(a)(2) that is used to determine the particular securities held by a beneficial owner after it has been determined that the beneficial owner is an insider subject to short swing recovery. See 17 C.F.R. S 240.16a-1(a)(2). Here, we do not pass upon this

rule. Because, as we have already noted, section 16 defines beneficial ownership, for the purpose of determining who is a principal shareholder, by reference to section 13(d) of the `34 Act, we turn now, as we must, to an examination of beneficial ownership under section 13(d).

Section 13(d) is essentially a reporting provision that requires the disclosure of certain information to the SEC, the issuing entity, and the exchanges where the stock is traded. See 15 U.S.C. S 78m(d)(1)(D) (1994). It provides as follows:

>  (d) Reports by persons acquiring more than five per centum of certain classes of securities.

>  (1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security . . . shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and filed with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors -- (A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

15 U.S.C. S 78m(d)(1) (1994). The text of this provision is clear on its face. After a person has acquired beneficial ownership of the relevant security, the person is required to file a report with various entities within 10 days. We observe that the heading of the subsection speaks in terms of a person who acquires beneficial ownership of a security. Next, we turn to the regulation promulgated by the SEC to implement this provision. SEC Rule 13d-3 provides in pertinent part:

>  (a) for the purposes of sections 13(d) . . . of the Act a beneficial owner of a security includes any person

8

who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares: (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or, (2) investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. S 240.13d-3 (2000) (emphasis added). Clearly, Rule 13d-3 casts a wide net in prescribing the sorts of activity that will qualify one as a beneficial owner of an equity security. Indeed, our sister circuits and various commentators have noted that in determining who is a beneficial owner of securities section 13d-3 focuses on the person who can actually vote the shares, rather than the record owner of the stock. See, e.g., Calvary Holdings, Inc., v. Chandler, 948 F.2d 59, 64 (1st Cir. 1991) (holding that record owner of stock was not a beneficial owner of the stock because he did not have the power to vote or dispose of the stock without the permission of others); GAF Corp. v. Milstein, 453 F.2d 709, 716 (2d Cir. 1971), cert. denied, 406 U.S. 910 (1972) (noting that voting control of stock is the only relevant element of beneficial ownership); Bath Indus., v. Blot, 427 F.2d 97, 112 (7th Cir. 1970) (noting that legal title is irrelevant for the purpose of the statute if someone else can guarantee a block of votes). The Rule, textually at least, like the statute it implements, is clear with respect to the type of activity that will qualify one as a beneficial owner of securities. Further, in casting its net, the Rule defines a beneficial owner as a person with certain attributes.

C. Group Beneficial Ownership.

Finally, we come to the crux of the matter before us-- whether an entity can be a member of a group of beneficial owners without first beneficially owning stock itself. To answer that question, we direct our attention to section 13(d)(3) of the Securities and Exchange Act of 1934, which outlines the contours of a "group." See  15 U.S.C. S 78m(d)(3) (1994); Morales v. Freund, 163 F.3d 763, 766 (1999). It has been noted by the only other court specifically addressing the issue before us that neither section 13(d)(3), its regulations, nor its congressional

9

commentary provides a clear answer with respect to the question before us. See Transcon Lines v. Becker , 470 F. Supp. 356, 372-73 (S.D.N.Y. 1979). We agree. After considering the text and its contextual relevance, both narrowly and in relation to the statute as a whole, we believe that the statute, the regulations, and the accompanying legislative history are ambiguous with respect to the specific question before us. It is true that elements of the language of the various statutes and regulations may, when read in isolation, support each party's position. In fact, in the case sub judice each party has cited to particular snippets of text from the statute, regulations, or legislative history that tends to support each side's respective construction. As we have previously stated, however, we do not base our construction of a statute, complex or not, on a sentence or two taken from volumes of statutory text, regulations, and legislative history.

The relevant text of section 13(d)(3) provides that "when two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a person  for the purposes of this subsection." 15 U.S.C. S 78m(d)(3) (1994) (emphasis added). This provision has the effect of aggregating the individual stock beneficially owned by each group member and attributing to each member the total holdings of the group. See, e.g., Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 123 (2d Cir. 2001). For example, if a group has three members each owning ten shares of stock, then each member will be treated as beneficially owning thirty shares of stock. Here, when defining a group, Congress chose to speak in terms of a person or persons acting for an enumerated purpose.

The implication of using the term "person" in subsection (d)(3) after its use in subsection (d)(1), which defines beneficial ownership, indicates to us that Congress intended to attribute the same meaning to person as it had in the preceding subsection defining beneficial ownership. In other words, the "persons" that subsection (d)(3) refers to are the same "persons" that Congress set forth in subsection (d)(1)--beneficial owners. We simply fail to see

10

why Congress would specifically state that the group shall be deemed a person if Congress did not intend to refer to persons as that term is used throughout the section.

Moreover, the Rule promulgated by the SEC to implement section 13(d)(3) provides support for this construction. Rule 13d-5 defines group beneficial ownership in pertinent part:

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership for purposes of sections 13(d) . . . of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons .

17 C.F.R. S 240.13d-5(b)(1) (2000) (emphasis added).

Keeping in mind the canon of construction that we must give effect to all the provisions of a statute or regulation, we conclude that the "persons" Rule 13d-5 speaks of are persons as that term is used in Rule 13d-3. To conclude otherwise would require us to disregard not only the text of the statutory provisions and the regulations promulgated under them, but also the context in which the provisions are used. Specifically, reading section 13(d)(3) and its regulations without acknowledging the meaning of "person" that Congress previously attributed to it in section 13(d)(1) would require us to read section 13(d)(3) in isolation. This we cannot do.

As a result, we construe the Rule to mean that when two or more beneficial owners agree to act together for one of the statutorily enumerated purposes the group formed would be deemed to be a beneficial owner of all of the securities held by its members. It necessarily follows from this precept, by negative implication, that one who does not have beneficial ownership of the equity securities of an issuer cannot be a member of a group of individuals that do have beneficial ownership.

Our construction is supported by section 13(d)'s legislative history and the early cases construing section 13(d). The legislative history accompanying section 13(d)(3) provides in pertinent part:

11

> Paragraph (3) of subsection (d) defines `person' as follows: `when two or more persons act as a partnership, limited partnership . . . or other group . . . such syndicate or group shall be deemed a `person' for the purposes of this subsection.' This provision would prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than 10 percent of the securities. The group would be deemed to have become the beneficial owner, directly or indirectly, of more than 10 percent of a class of securities at the time they agreed to act in concert.

H.R. REP. NO. 90-1711 at 7, reprinted in 1968 U.S.C.C.A.N. 2818 (emphasis added). Two observations are apparent. First, in the sentence immediately following the definition of "person," the commentary explains that the purpose of the provision is to prevent groups of persons from evading the statute. It would seem to us then, that in explaining its purpose, Congress used the term "person" in the same context that it defined the term "person" in the statutory scheme. We simply fail to see why Congress would suddenly depart from using its previous definition of "person" when explaining what the provision was designed to combat. Next, the commentary makes it clear that Congress was concerned about aggregations of beneficial owners coming together to form a group when it stated that the "provision would prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer." The implication is, of course, that each member of the group must have something to "pool". The commentary first gives the example of voting interests. Obviously, under the statutory definition of beneficial owner in section 13(d)(1) if one has voting interests of an equity security, one is a beneficial owner of the security. The commentary explains that it would prevent persons from pooling "other interests" in an issuer's securities. We believe that the "other interests" Congress referred to are contained in the second prong of section 13(d)(1)'s definition of beneficial ownership--the power to dispose of the security or the power to direct the disposition of the security.

12

Here, it would also seem that Congress did not intend to expand upon the scope of activity that encompasses beneficial ownership beyond that used in the previous subsection, because in discussing the provision's intended function, Congress did not add anything to its previous definition of a beneficial owner. We therefore conclude that the legislative history accompanying section 13(d) manifests Congress' intent that an individual must be a beneficial owner of an issuer's securities prior to becoming a member of a section 13(d) "group."

As a final aid to our inquiry, we now turn to the caselaw interpreting section 13(d). To our knowledge, the precise issue presented by this appeal has yet to be addressed by an appellate court. Indeed, it has been specifically addressed by only one district court. See Transcon Lines v. A.G. Becker Inc., 470 F.Supp. 356 (S.D.N.Y. 1979) (noting that the precise question is not clearly answered by the statute, its regulations, or legislative history). We observe, however, that the Transcon court did not engage in a thorough textual analysis, as we have here, of section 13(d) before concluding that beneficial ownership is a necessary prerequisite for entrance into a group. See id . at 374.

On the other hand, though not confronted with the precise issue before us, there are a number of appellate court decisions that lend additional support for our construction of section 13(d). In an early case construing the requirements of section 13(d), the Seventh Circuit concluded that "section 13(d) should be interpreted to require compliance with its disclosure provisions when, but only when, any group of stockholders owning more  than 10 percent of the outstanding shares of the corporation agree to act . . . ." See Bath Indus., Inc. v. Blot , 427 F.2d 97 (7th Cir. 1970). The D.C. Circuit likewise rejected the argument that a defendant could not be a group member because he "lacked involvement" with the issuing corporation because the defendant had a "substantial interest in the corporation by virtue of his individual stock holdings prior to becoming a group member." See SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1164 (D.C. Cir. 1978). Similarly, in affirming a District Court's finding of liability against a defendant for failing to file a Schedule 13D, the Second Circuit noted that

13

it had to evaluate the record to determine whether there was sufficient evidence to conclude that an understanding existed between the defendant and others holding beneficial ownership of more than 5 percent of the stock. See Wellman v. Dickinson, 682 F.2d 355, 363 (1982) (emphasis added). Thereafter, the court determined that each member of the alleged group had beneficial ownership of the issuing corporation's shares prior to becoming a group member. Id. See also Morales, 249 F.3d at 123 (stating that"S13(d) encompasses not only the isolated shareholder who accumulates shares of a corporation's common stock, but also a group of shareholders who undertake the same activity as part of a collective effort."). Thus, the various authorities cited above, while construing other aspects of group membership, all seemed to assume, a fortiori, that each individual member of the group must have beneficial ownership of the securities of the issuing entity prior to becoming a group member. As a result, based upon the statutory and regulatory text, relevant legislative history, and caselaw from our sister circuits, we conclude that for the purpose of determining who is a principal stockholder under section 16 of the `34 Act, each member of a section 13(d) group must hold beneficial ownership of the shares of the issuing entity prior to becoming a section 13(d) group member.

IV.

Having determined that membership in a section 13(d) group is contingent upon each member of the group holding beneficial ownership of the securities of the issuer in question, we now turn to Rosenberg's argument. In his opening brief, Rosenberg states that "section 13(d) does not require a member of a 13(d) group to beneficially own common stock of the subject issuer prior to its entry into such a group." See Appellant's Opening Brief at 15. Then, in an abrupt about face, Rosenberg, in his reply brief, argues that "Beneficial Ownership . . . Is the Necessary Element for membership in a group." See Appellant's Reply Brief at 1. Therefore, we will proceed on the basis that Rosenberg has conceded that membership in a 13(d) group is predicated upon each member of the group holding

14

beneficial ownership of the subject issuer's stock prior to becoming a group member. Since we agree with the District Court that XM did not exist before July 7, 1999, we need not address Rosenberg's group membership arguments with regard to XM.

Rosenberg, however, does not stop with XM. He also argues that the District Court erred by denying his request to amend his Complaint by adding WorldSpace as a Defendant. Appellant's Opening Brief at 15. In this vein, Rosenberg argues that WorldSpace was a group member by virtue of its entering into the stockholder agreement on June 7, 1999, with Motient's majority shareholders. Significantly, Rosenberg does not allege, nor could he on the record presented to us, that WorldSpace was, at any time prior to the transaction in issue, a beneficial owner of Motient Stock. As a result, we fail to see how WorldSpace could have been a section 13(d) group member. Indeed, based on our construction of section 13(d) and its regulatory provisions, WorldSpace, as a matter of law, could not have been a member of such a group precisely because it did not have beneficial ownership of any Motient shares prior to the formation of the section 13(d) group.

The consequence of our conclusion that WorldSpace, as a matter of law, could not have been a section 13(d) group member is that WorldSpace could not, in light of our agreement with the District Court's other findings, have violated section 16(b) because it was not a statutory insider of Motient before the purchase of Motient stock occurred. We note in passing that our disposition of this case makes it unnecessary for us to reach the question of whether WorldSpace became a beneficial owner of Motient shares that were purchased by XM.

V.

To recapitulate, we have concluded that, for the purpose of determining who is a principal stockholder under section 16 of the `34 Act, each member of a section 13(d) group must hold beneficial ownership of the equity securities of the issuing entity prior to its entry into such a group.

15

Accordingly, we will affirm the judgment of the District Court.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

16