

Opinions of the United
States Court of Appeals
for the Third Circuit

11-19-2002

# USA v. Whited

Precedential or Non-Precedential: Precedential

Docket No. 02-1112

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation
"USA v. Whited" (2002). *2002 Decisions.* Paper 751.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/751

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed November 19, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-1112

UNITED STATES OF AMERICA

v.

RUTH WHITED,
        Appellant

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 01-cr-00008)
District Judge: Honorable Edwin M. Kosik

Argued July 29, 2002

Before: BECKER, Chief Judge, ROTH and
RENDELL, Circuit Judges

(Filed: November 19, 2002)

        William Ruzzo, Esq., [ARGUED]
        590 Rutter Avenue
        Kingston, PA 18704
         Counsel for Appellant

        Lorna N. Graham, Esq., [ARGUED]
        Office of the U.S. Attorney
        235 North Washington Avenue
        P.O. Box 309, Suite 311
        Scranton, PA 18501
         Counsel for Appellee

OPINION OF THE COURT

RENDELL, Circuit Judge.

Ruth Whited appeals from the District Court's order
sentencing her to prison and requiring her to make
restitution for embezzling from a health care provider in
violation of 18 U.S.C. S 669. Whited challenges the
sufficiency of the charging indictment and the District
Court's jurisdiction to adjudicate the charge as set forth
therein. She also contends that the Commerce Clause does
not grant Congress the power to criminalize her actions,
and that 18 U.S.C. S 669 is thus unconstitutional as
applied to the facts of her case. We note that we are the
first court to address the constitutionality of this statute as
an exercise of Congress' power under the Commerce
Clause. We agree with the District Court that Whited's

indictment sufficiently alleged the material elements of the offense and that her conviction withstands constitutional scrutiny, and will affirm.

I.

The relevant facts are not in dispute and may be briefly recounted. As a receptionist for the Back Mountain Chiropractic Center ("the Center"), Whited was responsible for receiving payment from Center patients. It was common practice for patients to pay by endorsing a check from their insurance provider, Blue Cross of Northeastern Pennsylvania ("Blue Cross"), to the Center. During 1996 and 1997, Whited deposited over fifty of those checks into her personal account, totaling over $34,000.

In early 2001, Whited was charged by indictment of one count of theft or embezzlement in connection with health care, in violation of 18 U.S.C. S 669. That provision provides, in relevant part:

> Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally misapplies any of the moneys, funds, securities,

2

> premiums, credits, property, or other assets of a health care benefit program, shall be fined under this title or imprisoned not more than 10 years, or both . . . .

18 U.S.C. S 669.

The term "health care benefit program" is defined as:

> any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

Id. S 24(b).

The government's indictment charged:

> That from on or about November 1996 and continuing up to and including on or about November 1997, in the Middle District of Pennsylvania, the Defendant, Ruth Whited, knowing and willfully embezzled, stole or otherwise without authority converted to the use of any person other than the rightful owner, or intentionally misapplied any of the monies, funds, securities, premiums, credits, property or other assets of a health care benefit program to wit: approximately $5,956.52 of subscriber checks from Blue Cross of Northeastern Pennsylvania, a health care benefit program within the meaning of 18 United States Code Section 24(b), which

> checks rightfully belonged to the Back Mountain
> Chiropractic Center located in Dallas, Pennsylvania. 1

Whited originally pled not guilty, and subsequently filed
a motion to dismiss the indictment. She argued that the
indictment was insufficient because, although she admitted
she stole checks from the Center, the indictment appeared
to charge that Blue Cross, rather than the Center, was the
victim "health care benefit program." Further, she urged
that Congress did not have the authority to criminalize

_____

1. Although the indictment charged Whited with embezzling $5,956.52,
there was evidence indicating that the amount actually involved was far
greater. Whited and the government eventually agreed on $34,327 as a
reasonable figure for restitution purposes.

embezzlement from individual medical care providers such
as the Center. After the District Court denied the motion,
Whited withdrew her original plea and pled guilty to the
indictment. She was sentenced in January, 2002, and this
timely appeal followed.

On appeal, Whited reiterates the challenges to the
indictment she made in the District Court. First, she argues
that the indictment does not allege an essential element of
S 669, the theft or embezzlement from a "health care benefit
program." In her view, the indictment refers to subscriber
checks from Blue Cross, not the Center. She also contends
that the Center is not a "health care benefit program" as
defined in the statute. Thus, she asserts, the District Court
lacked subject matter jurisdiction to adjudicate this matter
because Congress did not criminalize embezzlement from a
mere medical care provider such as a chiropractor. Finally,
Whited argues that S 669 is unconstitutional as applied to
this case. She admits to embezzlement from the Center, a
medical care provider, but argues that Congress is without
the authority under the Commerce Clause to criminalize
that behavior because her theft from the Center lacked the
requisite relation to interstate commerce.

The District Court exercised jurisdiction to determine the
sufficiency of the indictment and interpret the relevant
statutes pursuant to 18 U.S.C. S 3231, and we have
jurisdiction under 28 U.S.C. S 1291. Although Whited did
not preserve her right to appeal the pretrial motion by
entering a conditional guilty plea, see Fed. R. Crim. P.
11(a)(2), all of the issues presented here properly fall within
the narrow scope of review not barred by a guilty plea. See
United States v. Rodia, 194 F.3d 465, 469 (3d Cir. 1999)
(stating that notwithstanding a guilty plea we retain
jurisdiction over issues that "go[ ] to the jurisdiction of the
District Court"); see also United States v. Garcia-Valenzuela,
232 F.3d 1003, 1006 (9th Cir. 2000) (listing issues
reviewable after an unconditional guilty plea, including the
constitutionality of the underlying statute and that the
indictment fails to state an offense); 15B Charles Alan

Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure S 3918.7 (2d ed. 1991) (same).

II.

Preliminarily, Whited argues that the indictment against her was insufficient because it failed to allege an essential element of the crime, and that the District Court was without subject matter jurisdiction to adjudicate the matter as set forth in the indictment. We find little merit to these arguments, and will treat them only briefly.

A.

We exercise plenary review over Whited's challenge to the sufficiency of the indictment. See Virgin Islands v. Moolenaar, 133 F.3d 246, 247 (3d Cir. 1998). Whited argues that the indictment does not allege an essential element of S 669, specifically the theft or embezzlement from a health care benefit program. She notes that the indictment identifies Blue Cross as a health care benefit program, but reiterates that her theft was from the Center, which is never explicitly identified as a qualifying program in the indictment.

We consider an indictment sufficient if, when considered in its entirety, it adequately informs the defendant of the charges against her such that she may prepare a defense and invoke the double jeopardy clause when appropriate. See, e.g., United States v. Stansfield, 171 F.3d 806, 812 (3d Cir. 1999); United States v. Turley, 891 F.2d 57, 59 (3d Cir. 1989).

Whited's argument hinges on the unfortunate fact that the indictment says both too much and too little. Because Blue Cross was not the entity defrauded by Whited, whether or not Blue Cross is a health care benefit program under 24(b) was entirely irrelevant, and the indictment's identification of Blue Cross as a qualifying program was thus entirely superfluous. But because the indictment did identify Blue Cross as a health care benefit program under 24(b), the indictment was problematic in that it did not similarly identify the Center as a qualifying program.

Despite this carelessness in language, the facts alleged do amount to a crime under 669. Again, the indictment reads, in relevant part:

> [T]he Defendant, Ruth Whited, knowing and willfully embezzled, stole or otherwise without authority converted to the use of any person other than the rightful owner, or intentionally misapplied any of the monies, funds, securities, premiums, credits, property or other assets of a health care benefit program to wit:

approximately $5,956.52 of subscriber checks from Blue Cross of Northeastern Pennsylvania, a health care benefit program within the meaning of 18 United States Code Section 24(b), which checks rightfully belonged to the Back Mountain Chiropractic Center located in Dallas, Pennsylvania.

The indictment clearly states that the checks at issue "belonged to" the Center, and that the theft was from a health care benefit program. The Center is thus identified as a health care benefit program by implication. As we discuss below, the Center is in fact a qualifying"health care benefit program" because it is an "individual or entity who is providing a medical benefit, item, or service for which payment may be made under [a qualifying health care] plan or contract." 18 U.S.C. S 24(b). Consequently, when considered in its entirety the indictment's charge-- that there was a theft from a health care benefit program of subscriber checks belonging to the Center -- suffered from no material omissions, sufficiently apprised Whited of the charges against her, and would enable her to invoke the bar of double jeopardy if necessary. See Turley , 891 F.2d at 59; see also Hamling v. United States, 418 U.S. 87, 117 (1974) ("[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."). Further, we note that there is no evidence that Whited was prejudiced by the potentially confusing indictment. See Stansfield, 171 F.3d at 811-12. Whited "acknowledge[d]" in her brief that the"indictment language [was] sufficient to put [her] on notice that she [was] accused of stealing property of Back Mountain Chiropractic Clinic," App. Br. at 12., and Whited's counsel conceded at oral argument that Whited in fact understood the document to

6

charge her with that crime. Thus, although poorly drafted, the indictment was legally sufficient.

B.

In the alternative, Whited contends that the Center is not a qualifying health care benefit program at all, and that consequently the District Court was without subject matter jurisdiction because the general theft or embezzlement from a medical care provider is not a federal crime. We disagree.

Our review over matters of statutory interpretation is plenary, and our role is limited to effectuating the intent of Congress. Rosenberg v. XM Ventures, 274 F.3d 137, 140 n.1, 141 (3d Cir. 2001). Congressional intent is presumed to be expressed through the ordinary meaning of the statute's plain language. Id. at 141. Here, Whited's contention that the Center is not a health care benefit program as defined in 18 U.S.C. S 24(b) is belied by the statutory language, which provides:

> [T]he term "health care benefit program" means any
> public or private plan or contract, affecting commerce,
> under which any medical benefit, item, or service is
> provided to any individual, and includes any individual
> or entity who is providing a medical benefit, item, or
> service for which payment may be made under the plan
> or contract.

18 U.S.C. S 24(b) (emphasis added).

The Center is a local provider of chiropractic services,
and even Whited concedes that payment is made for those
services through Blue Cross, which is undisputably a
health care benefit program. Section 24(b) explicitly
"includes" precisely those types of local medical service
providers. The statute thus makes clear Congress's intent
to criminalize theft or embezzlement under 18 U.S.C.S 669
when the victim of that theft or embezzlement is a medical
services provider -- such as the Center -- being
compensated pursuant to a public or private plan, such as
Blue Cross.

Despite the clarity of the statute's plain language, Whited
invokes certain portions of the statute's legislative history
in arguing that Congress did not intend to criminalize theft

7

from a local medical service provider. Where a statute is
"plain and unambiguous" on its face, however, further
inquiry into legislative intent is unnecessary. Rosenberg,
274 F.3d at 141. Here, nothing in the "language itself, the
specific context in which the language is used,[or] the
broader context of the statute as a whole" suggests any
ambiguity whatsoever. Id. Instead, the plain language of the
statute is strongly supported by the broader context of the
legislation, an extensive attack on frauds against the health
care industry. See Health Insurance Portability Act of 1996,
Pub. L. No. 104-191, 110 Stat. 1936. Accordingly, we
conclude that the Center is a qualifying "health care benefit
program" as defined in the statute, and that the District
Court therefore properly exercised subject matter
jurisdiction over Whited's criminal indictment.

III.

Having concluded that neither of Whited's arguments
relating to her particular indictment have merit, we turn to
Whited's constitutional challenge to her prosecution for a
federal offense. Whited argues that authorizing the
prosecution of individuals like herself who have simply
stolen from local medical service providers exceeds the
limited powers vested in Congress under the Commerce
Clause. Thus, Whited argues, 18 U.S.C. S 669 is
unconstitutional insofar as it was applied here.

The District Court disagreed. After noting that we are to
accord deference to Congressional determinations that

particular legislation is within its constitutional authority, the District Court wrote:

> [T]he United States correctly points out that a payer such as Blue Cross of Northeastern Pennsylvania made payments to Back Mountain under a contract with its subscriber under a health care program which Congress has deemed appropriate to regulate as an economic and commercial enterprise which affects interstate commerce by prohibiting fraud.

United States v. Whited, No. CR-01-0008, slip op. at 4 (M.D. Pa. May 12, 2001).

In its opinion, the District Court emphasized the interstate nature of the commercial enterprises and contractual relationships through which the payment for health care services is made. Ultimately, although reiterating its view that Congressional authority under the Commerce Clause is and should be limited, it held that Congress was within the appropriate scope of its power in criminalizing the actions at issue here. We exercise plenary review of the District Court's determination of the statute's constitutionality, United States v. Singletary , 268 F.3d 196, 198-99 (3d Cir. 2001), and will affirm.

A.

We are presented once again with the difficult and delicate task of determining whether Congress has exceeded its authority "[t]o regulate Commerce . . . among the several States," U.S. Const. art I, S 8, cl. 3, an issue that is now commonplace in our courts as a result of the Supreme Court's ruling in United States v. Lopez , 514 U.S. 549 (1995). In Lopez, the Court held that Congress had exceeded its Commerce Clause authority in adopting the Gun-Free School Zones Act of 1990, which essentially made it a federal crime to possess a firearm near a school. In doing so, the Court first clearly identified the three areas within which Congress is authorized to regulate pursuant to the Commerce Clause: (1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities;" and (3) "those activities having a substantial relation to interstate commerce." Id. at 558-59. Because the Gun-Free School Zones Act regulated neither the channels nor instrumentalities of commerce, the Court was left to consider whether the Act could be sustained as a regulation of activities substantially affecting interstate commerce. Id. at 559.

The Court reiterated that laws regulating intrastate economic activity have been upheld against Commerce Clause challenges where the underlying intrastate "economic activity substantially affects interstate commerce," or where the law regulates "activities that arise

out of or are connected with a commercial transaction,

which viewed in the aggregate, substantially affects interstate commerce." Id. at 560-61. In Wickard v. Filburn, 317 U.S. 111 (1942), for instance, the Court upheld Congressional regulation of production limits for wheat that was exclusively produced and consumed by a single local farm. The Court reasoned that even homegrown wheat in some sense competes with wheat traded in interstate commerce, particularly when considered in the aggregate. Id. at 127-28.

By contrast, the Gun-Free School Zones Act on its face criminalized an action -- gun possession near a school -- that is wholly unrelated to " 'commerce' or any sort of economic enterprise, however broadly one might define those terms." Lopez, 514 U.S. at 561. Nor was the Act "part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Id.

The Court further took note of two additional factors. First, the Act did not contain an "express jurisdictional element" that would limit its application to particular instances in which the "firearm possession[ ] . . . ha[d] an explicit connection with or effect on interstate commerce." Id. at 561-62. Second, "neither the statute nor its legislative history contain express congressional findings regarding the effects upon interstate commerce of gun possession in a school zone." Id. at 562 (quotations omitted). Although making clear that congressional findings are not required, the Court suggested that findings indicating the"legislative judgment that the activity in question substantially affected interstate commerce," would be helpful where the "substantial effect was [not] visible to the naked eye." Id. at 563.

Ultimately, the Lopez Court was unpersuaded by the proffered nexus between gun possession near schools and interstate commerce, the theory "that possession of a firearm in a school zone may result in violent crime and that violent crime can be expected to affect the functioning of the national economy." Id. at 563. That sort of tenuous connection, the Court reasoned, would impermissibly allow Congressional intervention in areas far beyond the scope of their necessarily limited powers. Id. at 564-67. In sum, the

Court concluded, "The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce." Id. at 567.

Five years later the Court struck down the Violence Against Women Act ("VAWA") in United States v. Morrison,

529 U.S. 598 (2000), which echoed both the holding of Lopez and its underlying reasoning. In Morrison, the Court again emphasized that the general nature of the regulated activity was not commercial or economic in character. Id. at 610-11. Although the Court specifically avoided adopting "a categorical rule against aggregating the effects of any noneconomic activity," it relied heavily for its ultimate conclusion on the fact that "[g]ender motivated crimes of violence are not, in any sense of the phrase, economic activity." Id. at 613.

The Morrison Court also followed the Lopez Court in taking note of the lack of a "jurisdictional element" in the VAWA, and in considering the presence or absence of congressional findings. Id. at 613. Unlike the Gun-Free School Zones Act, however, the legislative history of the VAWA was replete with extensive congressional findings "regarding the serious impact that gender-motivated violence has on victims and their families." Id. at 614. But the mere presence of congressional findings was not deemed dispositive, and the Court found that Congress's findings failed to support the requisite connection between gender-motivated violence and interstate commerce. Id. at 614-15. According to the Court, the findings at best demonstrated an attenuated but-for relation of the type specifically rejected in Lopez. Id. at 615-19. With or without congressional findings, the Morrison Court made clear that the Commerce Clause does not authorize Congress to "regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." Id. at 617.

B.

At the outset, we note that our analysis is to be conducted with the understanding that congressional acts are entitled to a "presumption of constitutionality," and will

11

only be invalidated upon a "plain showing that Congress has exceeded its constitutional bounds." Id . at 607. That presumption is "not a mere polite gesture. It is a deference due to deliberate judgment by constitutional majorities of the two Houses of Congress that an Act is within their delegated power . . . ." United States v. Five Gambling Devices, 346 U.S. 441, 449 (1953). Accordingly,"[a]lthough the judicial branch is the final arbiter of the constitutionality of a statute," we review Congress's determination that it was within its constitutional authority with "substantial deference." United States v. Gregg, 226 F.3d 253, 261 (3d Cir. 2000). In the particular context of the Commerce Clause, we have frequently framed our inquiry as the narrow one of whether Congress had a "rational basis" for concluding that the activity it was regulating -- here, theft involving the health care industry -- was sufficiently related to interstate commerce to support the statute's constitutionality. See, e.g., United States v. Spinello, 265 F.3d 150, 153 (3d Cir. 2001); Gregg,

226 F.3d at 261-62; see also Hodel v. Virginia Surface
Mining & Reclamation Assn., 452 U.S. 264, 276 (1981)
(same).

Like the statutes considered in Lopez and Morrison, 18
U.S.C. S 669 is properly analyzed as an attempt by
Congress to regulate within the third category of its powers
as enumerated by the Court -- those activities that are
substantially related to interstate commerce. As suggested
in our discussion above, there are four considerations
relevant to the determination of whether a particular law
regulates activity that has a substantial effect on interstate
commerce:

>     1) the economic nature of the regulated activity; 2) a
>     jurisdictional element limiting the reach of the law to a
>     discrete set of activities that additionally has an
>     explicit connection with or effect on interstate
>     commerce; 3) express congressional findings regarding
>     the effects upon interstate commerce of the activity in
>     question; and 4) the link between the regulated activity
>     and interstate commerce.

Gregg, 226 F.3d at 262 (citations omitted).

We conclude that, unlike the statutes considered in
Lopez and Morrison, Congress had a rational basis for
believing that S 669 regulates distinctly economic activity
bearing a clear and significant relation to interstate
commerce. Accordingly, we hold that Congress's
criminalization of the activity in question here was a proper
exercise of Congress's Commerce Clause authority.

1. The Economic Nature of the Regulated Activity

The first stage of our Commerce Clause analysis is an
inquiry into the fundamental character of the activity being
regulated. Our recent decisions in this area reflect the
importance of the initial inquiry into the character of the
underlying activity, and illustrate the crucial distinction
between real economic activity and the fundamentally
noneconomic activity at issue in Lopez and Morrison. Most
recently, in United States v. Spinello, 265 F.3d 150 (3d Cir.
2001), we upheld Congress's authority to criminalize bank
robbery pursuant to its Commerce Clause powers. In doing
so, we noted particularly that bank robbery is an
" 'economic' activity almost by definition" given that it is
motivated by money, explicitly affects money, and moreover
imposes substantial difficulties on the victim banks with
regard to their ability to interact appropriately with their
business partners. Id. at 156-57. Similarly, in United States
v. Bishop, 66 F.3d 569 (3d Cir. 1995), in which we upheld
the federal criminalization of carjacking, we stated that
"[w]hen a criminal points a gun at a victim and takes his or
her car, the criminal has made an economic gain and the
victim has suffered an undeniable and substantial loss." Id.
at 581. Thus, although we have held that "economic activity

can be understood in broad terms," Gregg, 226 F.3d at 262, we have also distinguished between activities that are essentially economic and those that "ha[ve] nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." Lopez, 514 U.S. at 561; see also United States v. Orozco , 98 F.3d 105, 107 (1996) ("Drug trafficking is an inherently economic activity; the mere possession of a fireau is not.").

Here, following these precedents, we can readily conclude that the activity regulated by S 669 -- theft in connection with health care -- is economic in nature. The theft itself is

13

motivated exclusively by an immediate pecuniary gain, see Spinello, 265 F.3d at 156, and effects an explicit economic transfer. See Bishop, 66 F.3d at 581. Moreover, S 669 is crucially "an essential part of a larger regulation of economic activity." Lopez, 514 U.S. at 561. The criminalization of theft in connection with health care was just one of a number of broad measures Congress enacted in its effort to "combat waste, fraud, and abuse in health insurance and health care delivery." Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. No. 104-191, 110 Stat. 1936. Accordingly, it can hardly be disputed that the theft criminalized by Congress here is fundamentally an economic endeavor.

2. The Presence of a Jurisdictional Element

The presence or absence of a jurisdictional element limiting the statute's scope to those cases with"an explicit connection with or effect on interstate commerce," is a second important factor in the constitutional analysis. Morrison, 529 U.S. at 611-612. Although the Supreme Court has made it unequivocally clear that the presence of a jurisdictional element is not dispositive of the statute's constitutionality, it is equally clear that its presence may "lend support" for that conclusion. Id. at 613. In short, a jurisdictional element can "ensure, through case-by-case inquiry, that the [crime] in question affects interstate commerce." Lopez, 514 U.S. at 561; see also Jones v. United States, 529 U.S. 848 (2000) (analyzing the federal arson statute's jurisdictional element to avoid potential constitutional issues and ensure the requisite nexus to interstate commerce).

The statute at issue here does benefit from the existence of a jurisdictional element. In relevant part, S 669 criminalizes theft from a health care benefit program, the definition of which is explicitly qualified with the phrase "affecting commerce." 18 U.S.C. S 24(b). Section 669 therefore criminalizes only thefts from health care plans or contracts -- or medical providers under those plans or contracts -- that affect commerce. See Jones , 529 U.S. at 854 (noting that the qualifying phrase "affecting commerce" generally "signal[s] Congress' intent to invoke its full authority under the Commerce Clause").

We recognize that this particular jurisdictional element could be said to be of little practical import. Given the complex state of modern health care delivery, it is difficult to envision any public or private health care plan or contract that does not affect commerce. That is, this jurisdictional element in actuality likely eliminates little from the scope of the statute's operation. If anything, however, that fact simply serves to strengthen our conclusion that Congress properly exercised its constitutional authority in criminalizing this activity under S 669. See Gregg, 226 F.3d at 263 (suggesting that a jurisdictional element is not essential where the regulated activity necessarily affects interstate commerce). And, if there is in fact a set of health care benefit programs that do not affect commerce, the presence of the jurisdictional element will properly exclude them. See, e.g., United States v. McGuire, 178 F.3d 203, 212 (3d Cir. 1999) (reversing a conviction because there was an insufficient connection to interstate commerce to satisfy the jurisdictional element). Overall, then, the jurisdictional element provides support for the conclusion that the crimes at issue here are sufficiently related to interstate commerce to be validly regulated pursuant to Congress's Commerce Clause authority.

3. The Presence of Congressional Findings

Although the Court has not departed from the general rule that Congress need not make explicit findings detailing the relationship some particular activity has with interstate commerce, it has directed that such findings may, on the margins, bolster an argument that such a relationship exists where it is not evident "to the naked eye." Lopez, 514 U.S. at 563. If Congress does make relevant findings, we must ask whether they actually support the existence of the requisite relationship. Morrison, 529 U.S. at 614-15. Thus, congressional findings may provide independent support for a determination of constitutionality, and may also serve to indicate whether Congress had a rational basis for concluding that the activity being regulated was sufficiently related to interstate commerce. See Gregg, 226 F.3d at 263.

Section 669 was enacted as part of the HIPAA, a massive statute marking significant legislative reform of the health

insurance industry. The most relevant and helpful piece of the legislative history with regard to the anti-fraud and abuse provisions of the HIPAA is a report prepared on that subject by the House Committee on Government Reform and Oversight ("Reform Report"). H.R. Rep. No. 104-747 (1996). The Reform Report summarizes the progression of earlier attempts at legislation to address fraud and abuse in the health care industry, and details the extensive need for

reform.

The Report states that according to 1995 figures, health care spending in the United States was approximately $1 trillion, divided among Medicare, Medicaid, and various State and private programs. Id. at 2. Strikingly, estimates indicated that as much as 10% of every health care dollar spent -- or $100 billion ($274 million a day)-- was lost to fraud and abuse. Id. at 2, 7.

These startling figures prompted numerous efforts at legislation, frequently including efforts to craft more efficient and effective federal criminal sanctions. Id. at 2-3. Not surprisingly, Congress was particularly concerned with large scale schemes to defraud Medicare, Medicaid, and massive private insurers operating on a national level, such as Aetna and Blue Cross. Nonetheless, Congress was presented with the unfortunate fact that the problems existed in "all segments of the health care industry" and "in every geographic area of the country." Id. at 3 (quoting United States General Accounting Office, Health Insurance: Vulnerable Payers Lose Billions to Fraud and Abuse  2 (1992)). That ubiquity suggests a rational basis for concluding, as Congress did, that even seemingly minor local thefts in connection with health care have direct and significant effects on interstate commerce.

First, the health care industry's troubling afflictions simply are not confined by "the jurisdictional boundaries that divide Federal, State and local health care finance and law enforcement." Id. at 1. The relationships among patients, providers, and insurers are extraordinarily complex, and Congress could certainly have reasonably determined that those sophisticated relationships made traditional distinctions between federal, state, and local governments at best unhelpful. Second, at its most general

16

level, Congress's motivation for the legislation was the simple fact that billions of dollars were being illegally removed from the health care system at the expense of ordinary citizens, who, as both taxpayers and consumers of health care services, bear directly the dramatic costs of those losses. With regard to the disturbing "scope and variety of health care fraud," the Reform Report quoted a Department of Justice report stating, "Everyone pays the price for health care fraud: beneficiaries for Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures." Id. at 4 (quoting United States Department of Justice, Department of Justice Health Care Fraud Report, Fiscal Year 1994 3 (1995)).

In sum, this history provides independent support for the conclusion that fraud and abuse within the health care industry is a massive national problem that transcends the

traditional boundaries of policing as between local, state, and federal governments. It is also readily apparent that such activity -- the illegal conversion of many billions of dollars annually -- has a substantial effect on interstate commerce. And given the scope and variety of the defects in the system, we cannot conclude that Congress was without a rational basis for determining that it was within its constitutional authority in criminalizing even seemingly minor local thefts or embezzlements in connection with health care. Thus, although the absence of detailed congressional findings would not alter our ultimate decision in this case, we find that the legislative history supports our conclusion that S 669 is a valid exercise of Congress's Commerce Clause authority.2

_____

2. It is worth noting that the Reform Report explicitly, if briefly, considered the question of whether criminalizing these activities was within Congress's Commerce Clause authority, and concluded that "Lopez and the subsequent lower court cases indicate [that Congress] may prescribe health care fraud under its commerce clause powers" because of health care fraud's "interstate attributes." Reform Report, at 14 n.46.

4. The Nexus Between the Regulated Activity and
Interstate Commerce

At the core of the Supreme Court's analysis in Lopez and Morrison was a justifiable if somewhat visceral skepticism about whether the activity being regulated could be sufficiently linked to interstate commerce. In short, the relationship was simply too attenuated -- a test for but-for causation may have been satisfied, but it was a search for proximate causation that was ultimately needed. Indeed, both opinions quoted Justice Cardozo's graphic allusion to this dilemma of causation in his concurring opinion in Schechter Poultry:

> There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.'

A.L.A. Schechter Poultry Corp. v. United States , 295 U.S. 495, 554 (1935) (Cardozo, J., concurring) (quoting United States v. A.L.A. Schechter Poultry Corp., 76 F.2d 617, 624 (2d Cir. 1935 (Hand, J. concurring)).

The Supreme Court's opinions in Lopez and Morrison make clear that the Court has ultimately been most concerned with the potential slipperiness of but-for reasoning. "In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or

consequence," Justice Kennedy noted, "but we have not yet said the commerce power may reach so far." Lopez, 514 U.S. at 580 (Kennedy, J., concurring). Allowing Congress to regulate in areas with such an attenuated connection to interstate commerce would be "unworkable if we are to maintain the Constitution's enumeration of powers," Morrison, 529 U.S. at 615, and would ultimately threaten the "distinction between what is truly national and what is truly local." Lopez, 514 U.S. at 567-68. In sum, the Court has simply been unwilling to "pile inference upon inference in a manner that would bid fair to convert congressional

authority under the Commerce Clause to a general police power of the sort retained by the States." Lopez, 514 U.S. at 567.

The question "is necessarily one of degree." Lopez, 514 U.S. at 567 (quoting NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37 (1937)). Whatever the "precise formulations" of the boundaries, however, we believe this case presents little worry of Congress overstepping its constitutional bounds. In essence, Whited argues that her minor theft from a local chiropractor has not even the most attenuated connection to interstate commerce. We disagree."If interstate commerce feels the pinch, it does not matter how local the operation which applies the squeeze." United States v. Women's Sportswear Mfg. Ass'n., 336 U.S. 460, 464 (1949).

In Wickard, the Court "emphasized that although Filburn's own contribution to the demand for wheat may have been trivial by itself, that was not 'enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial,' " Lopez, 514 U.S. at 556 (quoting Wickard, 317 U.S. at 127-28). That long-standing principle of aggregation is directly applicable to our facts. Although the wheat Wickard himself produced could scarcely be considered to have a substantial effect on the national wheat industry, when considered in conjunction with all those similarly situated it is evident that homegrown wheat does impact interstate commerce. Similarly, although Whited's $34,000 theft may seem relatively inconsequential or even de minimis when viewed within the broader context of the trillion dollar health care industry, when replicated over and again the economic effects of such acts are "indeed profound." 3 Bishop, 66 F.3d at 581. Thus, like the production of homegrown wheat in Wickard, theft or embezzlement in connection with health care is "an economic activity that . . . through repetition elsewhere, substantially affect[s] . . . interstate commerce."4

---

3. Notably, Congress was apparently concerned with thefts as small as $100, providing specifically in S 669 that such crimes could be punishable with up to a year in prison.
4. Moreover, because Congress had a rational basis for concluding that

theft in connection with health care substantially affects interstate

Lopez, 514 U.S. at 567. This case is therefore clearly distinguishable from those cases in which the requisite connection to interstate commerce was found to be lacking. See, e.g., McGuire, 178 F.3d at 212 ("Proof that [a] single bottle of orange juice was to have been used by a business that is . . . concededly local in character . . . is simply not sufficient" to satisfy the nexus to interstate commerce).

Unlike the attenuated but-for relationships present in Lopez and Morrison, the relation between theft in connection with health care and interstate commerce is direct and present. At the very least, we will not"second-guess" Congress's reasonable determination on that score.5 Bishop, 66 F.3d at 577.

_____

commerce, "we do not have the power to excise, as trivial, individual instances falling within that rationally defined class of activities." Bishop, 66 F.3d at 584 (quoting Maryland v. Wirtz, 392 U.S. 183, 193 (1968).
5. The reliance by Whited's counsel on United States v. Five Gambling Devices, 346 U.S. 441 (1953), is wholly without merit. We note in particular counsel's mischaracterization of that opinion in stating that the Court "invalidated a portion of the statute," and "reasoned [that] limits on the commerce power do exist, and [that] Congress had exceeded them in that case." App. Br. at 18. At issue in Five Gambling Devices was a statute that "prohibit[ed] shipment of gambling machines in interstate commerce [and] included incidental registration and reporting provisions" that were not expressly limited to interstate commerce. Five Gambling Devices, 346 U.S. at 442-45. Notwithstanding counsel's statements to the contrary, not a single member of the Court voted to invalidate any portion of the statute on Commerce Clause grounds. Moreover, not a single member of the Court even stated that it was his opinion that the statute was unconstitutional on those grounds. The judgment of the Court was announced by Justice Jackson who, in a plurality opinion joined by two other justices, employed the canon of avoidance and construed the statute to avoid any troublesome constitutional issues. Id. at 442-52. In doing so, Justice Jackson noted the potentially difficult Commerce Clause issues, but made absolutely no statement as to their merits. Id. Justice Black wrote a brief concurrence, joined by Justice Douglas, expressing his belief that the statute was unconstitutionally vague. Id. at 452-54. Justice Black's concurrence expressed no view whatsoever as to the Commerce Clause issues. Id. Justice Clark's dissent, which was joined by the three remaining members of the Court, was the only opinion to confront the Commerce Clause issue directly, and it argued strenuously that the statute at issue fell within Congress's authority. Id. at 454-463.

IV.

Although poorly drafted, Whited's indictment charged her with embezzling from the Center, a qualifying health care benefit program under the plain statutory language, and

thus sufficiently alleged the material elements of the offense. We further conclude that the application of 669 to Whited's theft was not a violation of the Commerce Clause. Section 669's regulation of theft or embezzlement from local medical service providers such as the Center is regulation of inherently economic activity. The statute contains a jurisdictional element limiting its applicability to particular instances affecting interstate commerce, and it is supported by a legislative history indicating its part in a comprehensive legislative response to profound problems in the health care industry that are not confined by traditional jurisdictional or geographic borders. Finally, within the broader context of medical service plans and contracts, Congress was certainly justified in concluding that the theft or embezzlement from even a local chiropractor such as the Center has a direct, present, and substantial relation to interstate commerce.

For all of the reasons recited above, the order of the District Court will be AFFIRMED.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit