**UNITED STATES of America, Appellee,**

**v.**

**Mario TRIBUNELLA,**
**Defendant-Appellant.**

**No. 208, Docket 84-1180.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 9, 1984.
Decided Nov. 29, 1984.

Paul J. Larkin, Jr., Dept. of Justice, Washington, D.C. (Salvatore R. Martoche, U.S. Atty., W.D.N.Y., Douglas E. Rowe, Dept. of Justice, Rochester, N.Y., on the brief), for appellee.

Ted A. Barraco, Rochester, N.Y., for defendant-appellant.

Before FEINBERG, Chief Judge, and MANSFIELD and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Mario Tribunella ("Tribunella") appeals from a judgment entered in the United States District Court for the Western District of New York, after a jury trial before Michael A. Telesca, *Judge,* convicting him of two counts of violation of the National Firearms Act ("Act"), 26 U.S.C. §§ 5801–5872 (1982), to wit: possession of an unregistered firearm, in violation of §§ 5861(d) and 5871, and possession of a firearm not having a serial number, in violation of §§ 5861(i) and 5871. Tribunella challenges his conviction principally on the ground that the firearm in question was an antique firearm, as defined in 26 U.S.C. § 5845(g), and thus was exempt from the requirements of the Act. In addition, he challenges a variety of rulings by the trial court and contends that the evidence was insufficient to show that he had possession of the firearm. Finding no merit in his contentions, we affirm the conviction.

## I. BACKGROUND

The present prosecution had its origin in information obtained by an officer of the Irondequoit, New York, Police Department from a confidential informant in the course of an investigation into the shooting of a reputed local leader of organized crime. Local and federal law enforcement officials were seeking the gun used in the shooting, a .22 caliber automatic or semiautomatic weapon.

In June 1983, the informant told Police Officer Martin Corbett that he had recently been invited to look at weapons by two men whom the law enforcement agents believed to be associates of a suspect in the shooting. The informant stated that he had thereafter accompanied two men and Tribu-

nella, all of whom the informant had known for several years, to a house which he described and at which Tribunella addressed a man standing in the driveway as "dad." Inside the house, in a basement room that appeared to be Tribunella's bedroom, Tribunella showed the informant an automatic .22 caliber pistol, a rifle, a full-length shotgun, and a sawed-off shotgun. The weapons had been concealed in various places about the room. Tribunella offered to sell the informant any of the weapons except the .22 caliber pistol. When the informant responded that he did not wish to purchase any of the weapons, Tribunella told him to forget what he had seen and not to tell anyone.

Corbett verified that Tribunella's residence matched the house described by the informant as the site of his gun inspection, and he learned from local and federal authorities that neither Tribunella nor his father, Richard A. Tribunella, had a valid pistol permit and that neither had registered a sawed-off shotgun pursuant to the Act.

Corbett recounted these facts in an affidavit which formed the basis for an application to Judge Telesca for a warrant to search the Tribunella family's residence for the four weapons described by the informant and for any indicia of the ownership of the weapons. Because the confidential informant had no prior record of providing information to law enforcement officials, and thus had no "track record" for reliability, the government called the informant as a witness before Judge Telesca so that the judge could assess the informant's credibility. The informant, identified as "John Doe," testified that each of the statements attributed to him by Corbett was true, and he provided other information upon cross-examination by the court. The court concluded that there was probable cause to search Tribunella's residence and issued the warrant.

The warrant was executed at about 6:00 p.m. on June 21, 1983. When the officers arrived in the Tribunella basement, the wood-paneled room contained, *inter alia*, a television set and a slot car set belonging to Tribunella, a stereo, a mattress with bedspread, a footlocker beside the mattress, and a fan. Tribunella was sleeping naked on the mattress. At the officers' request, Tribunella dressed and then left the room while the officers conducted the search.

The officers thoroughly searched the room and the rest of the basement and found a double-barreled sawed-off .12 gauge shotgun concealed in an area above the ceiling tile and underneath the first floor joist. The shotgun had a wrapping of black electrical tape. From inside or near the footlocker, the officers seized several boxes of ammunition, including .12 gauge shotgun shells, a hacksaw, a metal file, a partially used roll of black electrical tape, and mail addressed to Tribunella.

Tribunella was indicted in two counts, for possession of the shotgun as an unregistered firearm, in violation of §§ 5861(d) and 5871 (count one), and for possession of the shotgun as a firearm having no serial number, in violation of §§ 5861(i) and 5871 (count two).

## A. The Trial

At trial the government presented evidence as to the search of the basement and the items seized. Over Tribunella's objection, the court admitted into evidence photographs taken at the search, showing, *inter alia*, the shotgun ammunition, hacksaw, metal file, electrical tape, and a magazine displaying weapons on its cover.

The government sought to show, through the circumstances in which the gun had been found and through the testimony of Tribunella's family, that the shotgun had been in the possession of Tribunella. It called as witnesses Tribunella's mother and sister, who at first testified that the sister also used the basement to entertain friends and to sleep. Both conceded, however, that they had testified before the grand jury that the basement room was Tribunella's room, and that he had been sleeping there and using it as his room for the entire seven or eight years

the family had lived in the house. The sister admitted that she had told the grand jury that she did not use the room at all. Both mother and sister testified at trial that their testimony to the grand jury had been truthful. Both testified that they had never seen the sawed-off shotgun in the house and had never seen any member of the family with it. Tribunella's mother testified that Tribunella hunted and had guns.

■ Richard Tribunella, the father, testified that he did not use the basement room and that he did not own and had never seen the sawed-off shotgun.[1] He testified that his son occasionally slept in the basement and kept some guns there. Richard Tribunella also testified that he owned some shotgun shells that he kept in the basement. He did not know whether the shells found in the footlocker were his, as he had not hunted or touched a gun in 20 years.

The government also presented the testimony of Robert Stanton, a firearms examiner for the Rochester Police Department and Monroe County Public Safety Laboratory, that he had examined the shotgun found in Tribunella's basement. He testified that the shotgun's barrels measured approximately 10⅝ inches in length; that its overall length was 24 inches; and that both the stock and the ends of the barrels had been sawed off, and the barrels appeared to have been filed. He stated that a hacksaw of the type found in Tribunella's basement could have been used to shorten the shotgun. Stanton testified that the sawed-off shotgun was a center-fire-type weapon, meaning that the primer that ignites the powder and causes the shells to fire is located in the center-based portion of the shell; and that it used standard fixed ammunition, meaning a shotgun shell loaded with gun powder and primer. Stanton testified that, since no ammunition had been given him with the shotgun, he had test-fired it using standard .12 gauge shotgun shells that were commercially available, manufactured by Winchester. He found that both barrels of the weapon were functional and that the shotgun fired the Winchester ammunition with no problem. Stanton testified that most of the .12 gauge shotgun shells seized from Tribunella's basement appeared to be made by Winchester. He also testified that the gun was very old and that it lacked a serial number.

Finally, the government introduced a certificate from the Treasury Department's Bureau of Alcohol, Tobacco and Firearms, stating that the National Firearms Registration and Transfer Record had been searched and that no record had been found of any weapon being registered to Tribunella.

The only defense witness was Richard Zeusler, a dealer and consultant in antique firearms. Zeusler gave his opinion that the shotgun was an antique within the meaning of § 5845(g) of the Act because it had been manufactured sometime between the late 1870's and the early 1890's and was designed to fire a type of fixed ammunition made before 1899 that is no longer commercially available in the United States. He opined that the fact that the gun could fire modern ammunition not designed for it did not exclude it from the definition of an antique. He said many such guns could fire both types of ammunition, but that modern ammunition would eventually make the gun explode: "it could happen on the next shot, and it could be a hundred shots down the line ...."

At the close of the evidence, Tribunella moved for acquittal on the grounds (1) that there was insufficient evidence that the shotgun had been in his possession, and (2) that the shotgun was an antique within the

---

1. Tribunella contends that the elicitation of this testimony violated his father's Fifth Amendment privilege against self-incrimination because questions such as "Where do you live?" and "Is this your gun?" are incriminating in this type of case. Whatever the merit of such a contention might be, Tribunella has no standing to assert the alleged violation of the Fifth Amendment privilege of his father. *See, e.g., United States v. Minor,* 398 F.2d 511, 513 (2d Cir.1968) (Fifth Amendment privilege is personal), *aff'd,* 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969); E. Cleary, *McCormick's Handbook on the Law of Evidence* § 120, at 254 (2d ed.1972) ("It is clear that a criminal defendant cannot invoke the [Fifth Amendment] privilege of witnesses.").

meaning of § 5845(g), and was thus exempt from the requirements of the Act. The court denied the motion. As to the latter contention, the court ruled that "[r]egardless of the weapon's age, if it can use center fire ammunition and the ammunition is readily available in the ordinary channels of commercial trade the weapon is not an antique firearm." It instructed the jury that the shotgun was not an antique within the statutory definition.

The jury found Tribunella guilty on both counts. On count one, the court sentenced Tribunella to six months' imprisonment, with two and one-half years probation to follow his release from confinement; on count two, the court sentenced him to a concurrent term of probation. Execution of the sentence was stayed pending appeal.

## II. DISCUSSION

On appeal, Tribunella principally renews his contentions (1) that the shotgun was an antique within the meaning of § 5845(g) and thus was exempted from the requirements of the Act by § 5845(a), and (2) that the evidence as to possession was insufficient. We have considered all of his arguments and find them without merit.

### A. *The Antique Firearm Defense*

■ Section 5861 of 26 U.S.C. makes it unlawful for a person to possess a firearm that is not registered to him in the National Firearms Registration and Transfer Record, *id.* § 5861(d), or to possess a firearm that is not identified by a serial number, *id.* § 5861(i). The term "firearm" is defined in 26 U.S.C. § 5845(a), which provides in pertinent part as follows:

The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; .... The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

The term "antique firearm" is defined in § 5845(g) as

any firearm not designed or redesigned for using rim fire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898 (including any matchlock, flintlock, percussion cap, or similar type of ignition system or replica thereof, whether actually manufactured before or after the year 1898) and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

This definition thus creates two categories of antiques: the first, described in the clause preceding the parenthetical, focuses chiefly on the design of the weapon; the second, which follows the parenthetical, deals with the availability of ammunition. The pre-parenthetical portion of the definition is not in issue here. That portion excludes from the definition of antique any weapon that is designed for using conventional center fire ignition with fixed ammunition; both of the expert witnesses at trial made clear that the shotgun found in the ceiling was so designed. Thus, the first part of the § 5845(g) definition is not invoked by Tribunella.

Rather, Tribunella relies on the second part of the definition, contending that the shotgun was a "firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade." He construes this provision to mean that if ammunition *designed* for this shotgun is not now manufactured or commercially available, the shotgun is an antique within the meaning of § 5845(g). The government, on the other hand, asks us to interpret this language to

mean that if *any* ammunition usable in the weapon is readily available in the ordinary channels of commerce, the weapon is not an antique. We think the government's interpretation more nearly reflects both the statutory language and Congress's intent.

The language in question imposes two conditions related to ammunition, both of which must be satisfied for the gun to qualify as an antique. The first condition is that ammunition for the pre-1899 gun [2] "is no longer manufactured in the United States"; the second is that ammunition for the gun "is not readily available in the ordinary channels of commercial trade." Although the first condition appears to focus on ammunition designed specifically for the pre-1899 gun, no such focus is spelled out in the second condition. Tribunella's interpretation of the second condition as requiring only that specifically designed ammunition be unavailable is not definitely refuted by the language of the condition. Yet his argument would be more persuasive if, in the clause "for which ammunition is no longer manufactured in the United States and is not readily available," the words "and is not" had been replaced simply by the word "or," or if the word "not" had been replaced by the phrase "no longer"; either substitution would have made it clear that "not readily available" was intended to mean "no longer readily available."

In contrast, the government's interpretation, which itself requires some interpolation, is truer to the language Congress actually used. The government asks us to recognize that the two conditions relating to ammunition are discrete and to treat the

phrase "for which ammunition" as commutative, thereby reading the two conditions as (1) "for which ammunition is no longer manufactured," and (2) "for which ammunition ... is not readily available." We agree that the statute should be so parsed. The only difficulty in the government's contention that the second condition applies to any ammunition and not to just specially designed ammunition is that it attributes to the word "for" different connotations in the two conditions: in the first, "for" means "designed for use in"; in the second, "for" means "able to be used in."

We think the government's interpretation is more accurate than that of Tribunella. It is more likely that Congress meant the word "for" to have different connotations in accordance with its context than that it used the absolute word "not" to denote the less absolute concept of "no longer." Thus, we read § 5845(g) as excluding from the definition of antique any firearm for which any usable ammunition is readily available in ordinary channels of commerce.

This reading of the statutory language is consistent with Congress's goal in enacting the legislation containing the section, which was to achieve greater control and regulation of weapons that can be used in violent crimes. Section 5845 was modified in 1968 as part of the Gun Control Act of 1968, Pub.L. No. 90–618, 82 Stat. 1213 (1968), which amended both the National Firearms Act, of which § 5845(g) is a part, and Title IV of the Omnibus Crime Control and Safe Streets Act, Pub.L. No. 90–351, 82 Stat.

---

**2.** Although the phrase "any firearm using fixed ammunition manufactured in or before 1898" is in itself ambiguous since "manufactured in or before 1898" could linguistically refer either to the firearm or to the ammunition, the context and history of the provision make it clear that the date refers to the time of manufacture of the gun. First, § 5845(g) itself plainly envisions the possibility of post–1898 manufacture of ammunition; thus a reference to pre–1899 ammunition would have little meaning. Further, the 1898 date of demarcation had its origin a few months earlier in the Omnibus Crime Control and Safe Streets Act, Pub.L. No. 90–351, 82 Stat.

197 (1968), *see* note 4, *infra,* and, although 1898 was mentioned as "the approximate date ... of the transition in ammunition manufacture from the now obsolete black powder to the modern smokeless or progressive burning powder," 114 Cong.Rec. 14,793 (1968) (remarks of Senator Tower), the insertion of 1898 in the then-pending legislation was explained with the grammatically unambiguous statement that it was intended to exempt "certain firearms using fixed ammunition which *were* manufactured in 1898 or earlier," *id.* (remarks of Senator Tower; emphasis added).

197, 225 (1968) ("Omnibus Act"). The principal purposes of the Gun Control Act were to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States. S.Rep. No. 1501, 90th Cong., 2d Sess. 22 (1968). The Senate Report pointed out that in 1967, 134,000 American citizens had been victimized by gunmen in the United States. The firearms abuse problem had been partially addressed by the enactment of Title IV of the Omnibus Act, but that statute dealt with handguns rather than rifles and shotguns. Thus, a report of the House of Representatives Committee on the Judiciary stated that

> [t]he urgent necessity for adding restrictions on transactions in long guns equivalent to those Congress has already applied to handguns is sadly evident from recent history and mounting statistics. Of the 6,500 firearms murders in the United States each year, 30 percent, or over 2,000, are committed with rifles or shotguns. Ninety-five percent of all law enforcement officers killed in the line of duty are victims of firearms—and one out of every four of these is killed by a rifle or shotgun. ... President Kennedy, Martin Luther King, Jr., Medgar Evers, and the 16 dead and 31 wounded victims of a deranged man firing from the tower of the University of Texas were all shot by rifles or shotguns.

H.R.Rep. No. 1577, 90th Cong., 2d Sess. 7–8 (1968), reprinted in 1968 U.S. Code Cong. & Ad. News 4410, 4413. To give further aid in curbing the problem of gun abuse, Title I of the Gun Control Act, which amended the Omnibus Act and became §§ 921–928 of 18 U.S.C., imposed strict licensing requirements on persons who would, for example, sell or transport any of a variety of firearms in interstate commerce; and Title II amended the National Firearms Act to add certain devices to the listing of firearms that must be registered.

The exclusion of antiques from § 5845(a)'s definition of "firearm" was among the new provisions included in the Gun Control Act, and a similar exclusion was provided in 18 U.S.C. § 921(a)(3).[3] The exclusion of antiques reflected a concern that the Gun Control Act not unnecessarily interfere with the interests of institutions such as museums and of those engaged in the hobby of collecting antique guns. See, e.g., H.R.Rep. No. 1577, supra, at 9, reprinted in 1968 U.S. Code Cong. & Ad. News 4410, 4415; 114 Cong.Rec. at 26,863 (1968) (remarks of Senator Long). The fact, however, that the Gun Control Act restrictively defined antiques in terms of the type of ammunition the weapon could use reveals that Congress's overriding concern was for decreasing the violent use of guns. Thus, we conclude that the statutory scheme—of pervasive regulation of firearms, with an exemption for "antiques," but with the exclusion from the exemption of even old guns for which ammunition is still made or is readily commercially available—reflects an intention on the part of Congress to exclude from regulation only those weapons that are unlikely to be usable for violent acts.

This view is further supported by other parts of the statutory scheme and by com-

---

**3.** Section 921(a)(3) defines "firearm" to include "any weapon ... which will or is designed to or may readily be converted to expel a projectile by the action of an explosive," but provides that "[s]uch term does not include an antique firearm." Section 921(a)(16) defines "antique firearm" to mean

    (A) any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and

    (B) any replica of any firearm described in subparagraph (A) if such replica—
      (i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or
      (ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

18 U.S.C. § 921(a)(16).

ments of the legislators with respect to the various statutes' exemptions for antiques. In the National Firearms Act, for example, after providing that antiques are excluded from the term "firearm," § 5845(a) goes on to exclude other devices, except machineguns and "destructive devices," whose characteristics lead the Secretary of the Treasury to find that they are primarily collector's items that are "not likely to be used as a weapon." *See also* 26 U.S.C. § 5845(f) (device is not a "destructive device" subject to regulation if Secretary finds it not likely to be used as a weapon); 18 U.S.C. § 921(a)(4) (same). The remarks of several legislators similarly revealed that the unlikelihood of use as a weapon was viewed as a common characteristic of the devices intended to come within the definition of antiques. For example, in discussing the exemption for antiques proposed as part of the Omnibus Act,[4] Senator Tower described antiques as items that had "little, if any, practical use as a firearm in the modern connotation," and repeatedly referred to them as "obsolete" arms. 114 Cong.Rec. 14,793 (1968) (remarks of Senator Tower). He also likened them to "wooden model[s]" of guns. *Id.; see also* 114 Cong. Rec. 26,901 (1968) (remarks of Senator Dodd with respect to nonantique curio guns: "I am talking about lethal firearms, not antiques.").

In light of Congress's evident intent to regulate weapons that are not unlikely to be used as weapons, we conclude that

§ 5845(g)'s final clause should not be interpreted as though it referred solely to ammunition designed specifically for the pre–1899 firearm. If ammunition made for other weapons is readily available in commercial channels and is usable in a pre–1899 firearm, it cannot safely be inferred that the pre–1899 firearm is never likely to be used as a weapon. We thus conclude that § 5845 does not exempt such a firearm from the requirements of the National Firearms Act.

We are not deflected from this conclusion by the opinion of Tribunella's expert that an old gun using modern ammunition will eventually explode. The witness himself indicated that such a gun might be fired a hundred times before it would injure the shooter.[5]

### B. *The Possession Issue*

Tribunella next contends that the evidence presented at trial was insufficient to support a finding that he possessed the shotgun. He contends that the evidence demonstrated only that he was in close proximity to the weapon when it was found, not that he was in possession of it. We disagree.

■ Possession may be actual or constructive. *See United States v. Pelusio*, 725 F.2d 161, 167 (2d Cir.1983). "Constructive possession exists when a person ... knowingly has the power and the intention

---

**4.** The provision enacted as part of the Omnibus Act, which was amended a few months later by the Gun Control Act, read as follows:

The term 'antique firearm' means any firearm manufactured in or before 1898 (including any matchlock, flintlock, percussion cap, or similar early type of ignition system) or replica thereof, whether actually manufactured before or after the year 1898; and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States; and is not readily available in the ordinary channels of commercial trade.

Pub.L. No. 90–351, § 921(a)(15), 82 Stat. 197, 228 (1968). The current version of this provision appears in 18 U.S.C. § 921(a)(16), *see* note 3, *supra*.

**5.** We also reject Tribunella's argument that, because the government did not rebut the testimony of his expert witness that the shotgun was an antique within the meaning of § 5845, he was entitled to have the issue of whether the gun was an antique submitted to the jury as a question of fact. Zeusler's testimony that the weapon was an antique was the expression of an opinion on a question of law, not evidence of any fact. As an opinion on a question of law, it could properly have been excluded by the court, and there was no need for the government to rebut it. In the absence of any dispute that the shotgun had fired commercially available shotgun shells, or as to any other material fact regarding the design or condition of the weapon, the question of whether the gun was an antique within the meaning of the Act was properly decided by the court as a question of law.

at a given time to exercise dominion and control over an object," *id.* (quoting *United States v. Craven,* 478 F.2d 1329, 1333 (6th Cir.), *cert. denied* 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973), and "may be proved by direct or circumstantial evidence. It is not necessary that such evidence remove every reasonable hypothesis except that of guilt," *United States v. Craven,* 478 F.2d at 1333.

■ Viewing the evidence presented at trial in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and drawing all available inferences in favor of the jury's verdict, *e.g., United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983), we conclude that the evidence provided a sufficient basis for a reasonable juror to find that Tribunella had the power and the intent to exercise dominion and control over the shotgun. The gun was found in the basement of the house, above the ceiling of a room that Tribunella used as his bedroom. Tribunella had used that room as his for the entire seven or eight years in which the family had resided in the house. No other member of the family used the room. No other member of the family had ever seen or was aware of the sawed-off shotgun. There was thus no basis for any supposition that the gun belonged to anyone other than Tribunella. Tribunella's family testified that he owned other guns; and the items found in the room clearly reflected its occupant's interest in guns in general and permitted the inference of his involvement with this gun in particular. There were, near Tribunella's bed, a magazine about guns; ammunition that could be fired from the shotgun; a hacksaw and a metal file that could have been used to modify the shotgun; and tape of the type that had been wrapped around the shotgun. In short, the evidence showed far more than Tribunella's mere proximity to the shotgun and provided an

ample basis for a reasonable juror to find that Tribunella had constructive possession of the shotgun.[6]

### C. Other Contentions

■ Tribunella contends that the district court erred in denying, without an evidentiary hearing, his pretrial motion to suppress the items seized pursuant to the search warrant. The motion focused on a portion of the affidavit of Officer Corbett, submitted in support of the warrant application, which stated that the confidential informant had been adjudicated a Youthful Offender in 1979 in connection with a criminal mischief charge and had had no other difficulties with the criminal justice system. Tribunella presented the affidavits of three persons, all of whom assumed that the confidential informant was one Michael Romano, and one or more of whom stated that Romano had been dishonorably discharged from the Navy for dealing in narcotics and had been arrested for unlawful possession of weapons. In support of the motion to suppress, Tribunella argued principally that if Romano had falsified his arrest record, he likely falsified the other information he gave Corbett as well. The district court properly rejected these allegations and arguments as insufficient under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to warrant a hearing.

In *Franks* the Supreme Court ruled that an affidavit upon which a search warrant has been issued is presumptively valid, but that a hearing may be required if the defendant makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included" in the affidavit. *Id.* at 155–56, 98 S.Ct. at 2676. The Court made clear that "[t]he deliberate falsity or reckless disregard whose impeachment is permitted ... is only that of the affiant, not of any nongovernmental informant." *Id.* at 171, 98 S.Ct. at 2684.

---

**6.** This confluence of evidence justified the trial court's refusal to charge the jury that Tribunella's mere proximity to the shotgun would not provide a sufficient basis for a finding that he possessed the weapon.

The assertions in the affidavits produced by Tribunella fell far short of making any showing that Corbett, the affiant, made any knowingly false or reckless statement. The motion to suppress was properly denied without a hearing.

We have considered and rejected Tribunella's other arguments. They do not merit discussion.

### CONCLUSION

The judgment of conviction is affirmed. The mandate shall issue forthwith.