

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-25-2007

# USA v. Introcaso

Precedential or Non-Precedential: Precedential

Docket No. 05-4088

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Introcaso" (2007). *2007 Decisions.* Paper 283.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/283

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-4088

UNITED STATES OF AMERICA

v.

ALEXANDER M. INTROCASO,

Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Criminal Action No. 04-cr-00274)
District Judge: Honorable James K. Gardner

Argued April 24, 2007

Before: McKEE and AMBRO, <u>Circuit Judges</u>
ACKERMAN,[*] <u>District Judge</u>

<hr>

[*]Honorable Harold A. Ackerman, United States District
Judge for the District of New Jersey, sitting by designation.

(Opinion filed:  October 25, 2007)

William T. Lawson, III, Esquire (Argued)
1420 Walnut Street
Philadelphia, PA   19102

        Counsel for Appellant

Patrick L. Meehan
   United States Attorney
Robert A. Zauzmer
   Assistant United States Attorney
   Chief of Appeals
Seth Weber (Argued)
    Assistant United States Attorney
Office of the United States Attorney
504 West Hamilton Street
Allentown, PA   17901

        Counsel for Appellee

------

OPINION OF THE COURT

------

AMBRO, Circuit Judge

        We decide principally whether a 19th-Century shotgun
hanging on a defendant's living room wall qualifies as an

2

"antique firearm" not subject to the general registration requirement of the National Firearms Act, 26 U.S.C. §§ 5801–72. A jury convicted Alexander M. Introcaso in the United States District Court for the Eastern District of Pennsylvania on two counts of violating the Firearms Act by possessing an unregistered firearm (the shotgun) and unregistered destructive devices (hand grenades). In addition to Introcaso's contention that the shotgun was an antique firearm, he argues that the evidence presented at trial was insufficient to prove that he was in possession of the hand grenades and that the sentence imposed was unreasonable because the Government failed to establish guilt on either count.

We disagree with Introcaso's possession argument as to the hand grenades, and thus affirm on that count. But after examining the statutory text and its history as to whether the Firearms Act required Introcaso to register the gun in question, we conclude that the statute is ambiguous. In the face of this ambiguity, we apply the rule of lenity (which instructs that statutory ambiguities should be resolved in favor of the defendant), and conclude that there has been no violation of the Firearms Act on the firearm count. Accordingly, we reverse the conviction and vacate the sentence on that count. As we shall see, these actions have no effect on Introcaso's sentence (save the minimal special assessment).

## I.       Factual Background

On February 2, 2004, the Lehigh County Sheriff's Office in Pennsylvania responded to a Protection from Abuse (PFA) order,[1] which required Introcaso to "immediately relinquish" all weapons to law enforcement, barred him from the marital residence shared with his wife, Samia Introcaso, and prohibited him from having any communication with her.  Pursuant to the PFA order, and at the direction of Introcaso's wife, police officers searched the house and found 28 firearms (including handguns and rifles), a machete, 21 knives, seven swords, and hundreds of pounds of ammunition.  The police seized the weapons, but physically were unable to take the ammunition, which they left to retrieve later.  One week later, Mrs. Introcaso again called the sheriff's office to inform them that she had found still more firearms belonging to her husband that she wanted removed from the house.  One of the firearms was a 19th-Century shotgun that was displayed on a wall and not registered; it forms the basis for Count 1 of the indictment against Introcaso: knowing possession of a short-barreled rifle ("sawed-off shotgun") in violation of 26 U.S.C. § 5861(d).  *See*

---

[1] The Pennsylvania Protection from Abuse Act,  23 Pa. Cons. Stat. Ann. §§ 6101–22, allows a plaintiff to obtain a PFA order upon, *inter alia*, proof of abuse by a preponderance of the evidence at a hearing.  *See* 23 Pa. Cons. Stat. Ann. §§ 6107, 6108.  A PFA order usually prohibits communication between the plaintiff and the defendant, 23 Pa. Cons. Stat. Ann. § 6108(a)(6), and may, as here, entail other requirements.

*also id.* § 5845(a) (defining "firearm"), *id.* § 5871 (specifying penalty).

Again, pursuant to the initial PFA order as well as Mrs. Introcaso's signed written consent to the search, the police retrieved six more firearms (a Thompson submachine gun, an M-14 rifle with a scope, a nine-millimeter pistol, two handguns, and another rifle), plus several military-style ammunition boxes, containing three live hand grenades and related components for explosive devices (black gun powder and fuse wire). The latter items were found inside a locked cabinet, for which the keys that Mrs. Introcaso had given the police did not work, forcing them to break open the lock (again with her consent). These items form the basis for Count 2 of the indictment: possession of unregistered destructive devices, also in violation of 26 U.S.C. § 5861(d). *See also id.* § 5845(f) (defining "destructive device"), *id.* § 5871 (specifying penalty).

In May 2004, a federal grand jury returned an indictment charging Introcaso with illegal possession of an unregistered firearm and possession of unregistered destructive devices. At the conclusion of trial in January 2005, the Judge declared a mistrial because the jury was deadlocked. At the end of a second trial in May 2005, a jury returned a guilty verdict on both counts of the indictment. Soon after, Introcaso filed post-trial motions for acquittal, arrest of judgment, and for a new trial. At a sentencing hearing in August 2005, the District Court denied all of Introcaso's post-trial motions and sentenced him to six

months' imprisonment and six months' supervised release on count one; 46 months' imprisonment and three years' supervised release on count two; a fine of $2,000; and a special assessment of $200. The imprisonment terms were to run concurrently.

Introcaso now appeals to us, asserting three claims: (1) that the Government failed to prove all the elements sufficient to support a conviction for possession of an unregistered firearm, as the gun at issue fell within an "antique" exception to the firearm registration requirement; (2) that the Government failed to prove all the elements to support a conviction for possession of destructive devices, as he was not in sole possession of the devices; and (3) that the sentence was unreasonable. On the basis of these claims, Introcaso also challenges the Court's denial of his post-trial motions for acquittal, arrest of judgment, and for a new trial.[2]

---

[2] The District Court had subject matter jurisdiction over this case under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1).

We review *de novo* a district court's denial of a judgment of acquittal pursuant to Rule 29. *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006). We must sustain the verdict if, viewing the evidence in the light most favorable to the Government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Flores*, 454 F.3d at 154; *United States v. Jannotti*, 673 F.2d 578, 598 (3d Cir. 1982) (*en banc*).

## II.     Statutory Analysis[3]

### A.     Statutory Text

The plain language of the statute is the "starting place in our inquiry." *Staples v. United States*, 511 U.S. 600, 605 (1994). "If the language of a statute is clear[,] the text of the statute is the end of the matter. If the language is unclear, we attempt to discern Congress' intent using the canons of statutory construction." *United States v. Jones*, 471 F.3d 478, 480 (3d Cir. 2006) (citations, quotation marks, and brackets omitted).

The Firearms Act generally requires firearms to be registered in the National Firearms Registration and Transfer Record, which is maintained by the Secretary of the Treasury.

---

We review a district court's refusal to grant a new trial pursuant to Rule 33 for abuse of discretion. *United States v. Jasin*, 280 F.3d 355, 360 (3d Cir. 2002). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002).

[3] We exercise plenary review over issues of statutory interpretation and are limited to giving effect to congressional intent. *United States v. Whited*, 311 F.3d 259, 263 (3d Cir. 2002).

26 U.S.C. § 5841. "Firearm" is defined as follows:

> (a) Firearm.—The term "firearm" means (1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device. *The term "firearm" shall not include an antique firearm* or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

26 U.S.C. § 5845(a) (emphasis added).[4]  For purposes of the

---

[4] Possession of any unregistered "firearm" is a criminal act, punishable by up to ten years' imprisonment or fines not to

8

antique-firearm exception, "antique firearm" is defined as follows:

> (g) Antique firearm.—The term "antique firearm" means any firearm not designed or redesigned for using rim fire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898 (including any matchlock, flintlock, percussion cap, or similar type of ignition system or replica thereof, whether actually manufactured before or after the year 1898) and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

26 U.S.C. § 5845(g).

Neither party contests that Introcaso owned a pre-1899 shotgun that was not registered. The gun was double-barreled, with an overall length measuring 18 5/8 inches, and a barrel-length of 10 3/4 inches each. App. 371, 373 (Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) agent's testimony). These measurements meet the statutory requirements for "firearm" under § 5845(a)(1)–(2), subjecting

---

exceed $10,000. 26 U.S.C. §§ 5861(d) & 5871.

this gun to a registration requirement unless it met the specifications of the antique-firearm exception.[5]

Introcaso argues that he was exempt from a registration requirement because the definition of "antique firearm" encompasses all pre-1899 guns for which fixed ammunition specifically designed for that gun is no longer made or readily available.[6] For support, he cites the expert testimony of an ATF

---

[5] We note that the ATF agent testified that the gun may have been modified from its original design because it appeared to have a shortened stock and shortened barrel muzzles. *See* App. 366, 370–71, 394. He was unsure whether it was in fact modified, when, or by whom. *See* App. 394–95. In any event, we need not address any implications of redesign, as this issue is not before us. The Government did not at trial, and does not on appeal, contend that the gun fails to fit the definition of antique because it was "redesigned."

[6] Introcaso does not contend that the shotgun is a "device . . . which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon." 26 U.S.C. § 5841(a). Nor is there any indication that the Secretary has made—or, indeed, given the Government's position in this case, is likely to make—the determination that the shotgun is primarily a collector's item and not likely to be used as a weapon. Accordingly, we consider only whether the shotgun fits the "antique firearm" prong of the exception.

10

agent who determined that the gun was manufactured between 1877 and 1893. *See* App. 366–67, 390–91. In addition, the 18.2-millimeter shot made for guns of this type is no longer manufactured or readily available. *See* App. 396–97.[7]

---

[7] An exchange between defense counsel and one ATF agent highlights the central issue here:

> ATF Agent: Underneath the barrels, and this was common for Belgium made shotguns in that period, there would be a number. In this case . . . [it was] 18.2, which is in millimeters, which designates the—the caliber or the bore, which in this case would be 12-gauge.
>
> . . .
>
> Counsel: [18.2] millimeters . . . transfers to 12-gauge?
>
> ATF Agent: Roughly, yes. . . . Well, it wouldn't be exactly 12-gauge. It's an equivalent to 12-gauge, but we would [not] designate 12-gauge.
>
> . . .
>
> Counsel: I understand that [a 12-gauge shotgun shell] may work in the gun, but as far as what it was designed to do?

ATF Agent:  [T]he cartridge fits neatly in the chamber. It's not loose or too tight. . . .

Counsel:    Okay. Well, you'll agree with me that, for example, a [.]38[-]caliber casing would fit inside a gun that was designated to fire a [.]357 type ammunition?

ATF Agent:  That's correct.

Counsel:    So, I guess what I'm wondering is, is there any designation on this gun that says it's a 12-gauge shotgun?

ATF Agent:  Other than the marking 18.2 [millimeters], no . . . .
            . . .
Counsel:    [The] 12-gauge ammunition . . . you fired in the gun . . . would not have been available in the form in which you used [it] when the gun was manufactured in Belgium between 1877 and 1893, correct?

ATF Agent:  As far as the gauge size, it would have been available. The type of shell that I used had a plastic hole.

12

The Government contends that a gun is not antique, even if manufactured before 1899, if it fits the definition for firearm and if any fixed ammunition can be found in a commercial market that can be used to fire the gun. Although 18.2-millimeter shells are no longer available, an ATF agent testified that the gun can fire fixed ammunition that is currently commercially manufactured in the United States, namely 12-gauge shotgun shells. *See* App. 364–69, 396–97. In fact, an ATF agent testified that he had test-fired the gun successfully with 12-gauge shotgun shells. *See* App. 368–70, 379–81. Thus, we must decide whether the antique firearm exception applies to pre-1899 guns for which the ammunition initially designed for them is no longer available. If it does not, we will uphold Introcaso's conviction on count one, but if it does, we will reverse it.

The plain text of the statute clearly exempts, *inter alia*, antique firearms, but provides little guidance concerning the precise question presented here.[8] As the parties suggest, "for"

---

> Back then they were paper shells, but, basically, it was the same type of shell . . . [but] [n]ot the identical shell.

App. 396–97.

[8] There is no dispute that the shotgun here uses fixed ammunition; thus the first part of the definition in subsection

13

in the phrase "for which ammunition is no longer manufactured," § 5845(g), can be read two ways: in the sense of "specifically designed for" (design) or "able to be used in" (usability). If we read "for" to refer to design, that sense applies to both predicate phrases: guns are antique if manufacturers have stopped issuing ammunition of a specific design and if the market likewise no longer provides ammunition (here shells) of that design. The other reading would require us to understand "for" in two different senses: guns are antique if manufacturers have ceased to produce shells of a particular design for use in a range of guns of a certain period (design) and if the market no

_____

(g), referencing "rim fire," does not apply. There is also no dispute that this is not a weapon that the Treasury Secretary already has designated as an antique; thus, the definition in subsection (a) does not apply. Finally, as the Second Circuit Court of Appeals has observed, while the phrase "any firearm using fixed ammunition manufactured in or before 1898" is potentially ambiguous because "'manufactured in or before 1898' could linguistically refer either to the firearm or to the ammunition," any doubt as to the meaning is resolved by "the context and history of the provision[, which] make it clear that the date refers to the time of manufacture of the gun." *United States v. Tribunella*, 749 F.2d 104, 109 n.2 (2d Cir. 1984); *see also id.* ("[T]he insertion of 1898 in the then-pending legislation was explained with the grammatically unambiguous statement that it was intended to exempt 'certain firearms using fixed ammunition which were manufactured in 1898 or earlier.'" (quoting 114 Cong. Rec. 14793 (1968) (remarks of Senator Tower))).

14

longer has shells that can be used in these guns (usability). *Id.* Although the first seems to us to be a better or more likely reading, it does not reveal definitively congressional intent on this matter.

## B.    Statutory Purpose

We next look to statutory purpose to the extent we can discern it. *See, e.g.*, *Nugent v. Ashcroft*, 367 F.3d 162, 170 (3d Cir. 2004) ("[To resolve ambiguous terms,] courts should look to the reading that 'best accords with the overall purposes of the statute' . . . .") (quoting *Moskal v. United States*, 498 U.S. 103, 116–17 (1990)). It is evident "from the face of the Act that the [Firearms Act]'s object was to regulate certain weapons likely to be used for criminal purposes." *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992); *see also* S. Rep. No. 90-1097, at 2–3 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2113, 2113–14 (noting concerns that firearms be kept away from those not legally entitled to possess them because of age, criminal background, or incompetency in order to decrease gun-violence); H.R. Rep. No. 90-1577, at 7–8 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 4410, 4413 (listing statistics of those killed by unlawful guns). At the same time, by adding the antique-firearm exception in 1968, Congress also "intended to preclude coverage of antique guns held by collectors 'in pursuance of the clearly indicated congressional intent to cover under the National Firearms Act only such modern and lethal weapons, except pistols and revolvers, as

15

could be used readily and efficiently by criminals or gangsters.'" *Thompson/Center*, 504 U.S. at 517 (citing H.R. Rep. No. 83-1337, at A395 (1954)); *see also* H.R. Rep. No. 90-1577, at 9, *as reprinted in* 1968 U.S.C.C.A.N. 4410, 4415; 114 Cong. Rec. 26863 (1968) (remarks of Senator Long).

This legislative history does not determine our issue because that history reveals two competing purposes: (1) regulation of guns to control violence and (2) avoiding placing undue burdens on museums and gun collectors.[9] The facts here may be read to meet the concerns of both—the former from the perspective of the Government viewing Introcaso as a violence-prone gun owner, and the latter from the perspective of Introcaso as a gun collector.

**C.    Analysis of the Second Circuit Court of Appeals**

In its review of a similar case, the Second Circuit Court of Appeals offered a different interpretation of the antique firearm exception. *United States v. Tribunella*, 749 F.2d 104,

---

[9] For a detailed recitation of the Firearm Act's legislative history, see *Thompson/Center*, 504 U.S. at 516–17 (arguing that the congressional purpose was to regulate weapons useful for criminal purposes, but applied only to "such modern and lethal weapons . . . as could be used readily and efficiently by criminals or gangsters") (quoting H.R. Rep. No. 90-1337, at A395 (1954)).

109 (2d Cir. 1984).[10]  In that case, Tribunella was convicted for possession of an unregistered double-barreled sawed-off shotgun that police found concealed in an area above the ceiling tile of his basement bedroom.  *Id.* at 106.  A firearms expert from the local police department examined the gun and testified that its measurements fit the statutory ones for "firearm," and that he successfully test-fired it using standard 12-gauge shotgun shells that were commercially available.  *Id.* at 107.  A dealer and consultant in antique firearms gave his expert opinion that the shotgun had been manufactured before 1899 "and was designed to fire a type of fixed ammunition made before 1899 that is no longer commercially available in the United States." *Id.*  Furthermore, he testified that while the gun—like many other antiques—could fire ammunition not designed for it,

---

[10] This Court is the only other Circuit Court to address our issue in a precedential opinion.  The Seventh Circuit Court has addressed it in two non-precedential decisions on similar facts—one of them relying on *Tribunella*.  *See United States v. Turnbough*, Nos. 96-2531, 96-2677, 114 F.3d 1992 (Table), 1997 WL 264475, at *3 (7th Cir. May 14, 1997) (non-published order) (citing *Tribunella*, 749 F.2d at 108–11); *United States v. Hope*, No. 93-2868, 56 F.3d 67 (Table), 1995 WL 309629, at *1 (7th Cir. May 18, 1995) (non-published order) ("The district court expressly found at the sentencing hearing that the shotgun was tested 'using commercially available federal 10-gauge shot shell[s],' and that the test firing disclosed that the firearm was 'capable of expelling a projectile by the action of an explosive.'").

17

"modern ammunition would eventually make the gun explode: 'it could happen on the next shot, [or] it could be a hundred shots down the line . . . .'" *Id.*

Construing the antique-firearm exception's two conditions (that ammunition for the gun "is no longer manufactured" and that ammunition for the gun "is not readily available"), the Court opined that "[a]lthough the first condition appears to focus on ammunition designed specifically for the pre-1899 gun, no such focus is spelled out in the second condition." *Id.* at 109. It rejected Tribunella's interpretation of the second condition "as requiring only that specifically designed ammunition be unavailable," though it acknowledged that his view was "not definitely refuted by the language of the condition." *Id.* Instead, it adopted the Government's interpretation that "the second condition applies to any ammunition and not to just specially designed ammunition [if one] attributes to the word 'for' different connotations in the two conditions: in the first, 'for' means 'designed for use in'; in the second, 'for' means 'able to be used in.'" *Id.* Though this reading "requires some interpolation," the Court concluded that it was "truer to the language Congress actually used," as "[i]t is *more likely that Congress meant* the word 'for' to have different connotations in accordance with its context than that it used the absolute word 'not' to denote the less absolute concept of 'no longer.'" *Id.* (emphasis added). Moreover, it acknowledged the dual purposes behind the statute, *id.* at 110–11 (detailing the statutory and legislative history), but determined that decreasing

18

gun violence was the "overriding concern." *Id.* at 110. "If ammunition made for other weapons is readily available in commercial channels and is *usable* in a pre-1899 firearm," it reasoned, "it cannot safely be inferred that the pre-1899 firearm is never likely to be used as a weapon." *Id.* at 111. Therefore, the Court concluded, the firearm exception "exclud[es] from the definition of antique any firearm for which *any usable ammunition* is readily available in ordinary channels of commerce." *Id.* at 109 (emphasis added).

## D.      Design versus Usability

Though its reasoning is plausible, we do not agree with the Second Circuit Court of Appeals' analysis. The Court acknowledged that the statutory language was ambiguous and the statutory purposes varied. *Id.* (acknowledging that Tribunella's interpretation was "not definitely refuted by the language of the condition," that the Government's reading "require[d] some interpolation," but that "[i]t is *more likely that Congress meant* the word 'for' to have different connotations" in support of the Government's view) (emphasis added).

When a criminal statute's language is unclear, we cannot satisfy ourselves with what we think Congress "more likely" intended without some clear indication of what it actually intended. *See United States v. Gradwell*, 243 U.S. 476, 485 (1917) ("[B]efore a man can be punished as a criminal under the Federal law his case must be plainly and unmistakably within

19

the provisions of some statute.") (citation and quotation marks omitted); *see also United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) ("The rule that penal laws are to be construed strictly . . . is perhaps not much less old than construction itself."); *Thompson/Center*, 504 U.S. at 517–18 (applying the rule of lenity to the Firearms Act to conclude that an arms manufacturer had no tax liability for "[m]aking" a firearm because of ambiguity in the ambit of the statute and because significant penal sanctions attached to violations of the payment requirement). The rule is designed to ensure that legislatures and not courts exact penal laws as well as to ensure that individuals have fair notice of what the law requires so as to avoid arbitrary enforcement. *McBoyle v. United States*, 283 U.S. 25, 27 (1931) ("Although it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world[,] in language that the common world will understand, of what the law intends to do if a certain line is passed."); *Wiltberger*, 18 U.S. (5 Wheat.) at 95 ("[T]he power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment."); *Smith v. United States*, 360 U.S. 1, 9 (1959) (applying the "the traditional canon of construction which calls for the strict interpretation of criminal statutes and rules in favor of defendants where substantial rights are involved," in part to avoid "oppressive and arbitrary proceedings").

20

As noted, the statutory text, history and legislative purpose do not provide clarity, because they recognize opposing interests in regulating guns that may be used for violence and in avoiding placing burdens on gun collectors. With these competing concerns, the question for us is what conduct Congress intended to, and did, criminalize. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *United States v. Bass*, 404 U.S. 336, 348 (1971). Thus, to criminalize possession of purported antique firearms that may fit the technical definition of "firearm," Congress must have "'spoken in language that is clear and definite.'" *Jones v. United States*, 529 U.S. 848, 858 (2000) (quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22 (1952)). Here, where we are left with "no more than a guess," *Ladner v. United States*, 358 U.S. 169, 178 (1958), as to what it was more likely that Congress intended, we should resolve the case in Introcaso's favor. Because Congress did not declare clearly an intent to impose a registration requirement on pre-1899 firearms in which any modern ammunition is usable (in addition to or instead of guns for which ammunition is specifically designed), we apply the rule of lenity to conclude that Introcaso is not liable for failing to register the firearm in question.[11]  We will

---

[11] Moreover, we note that it was apparently impossible for Introcaso to register this gun. According to the ATF agent, this gun—like other 19th-Century guns—did not have a serial

21

therefore reverse his conviction and vacate his sentence on the first count of the indictment.

### III. Unregistered Destructive Devices

Introcaso argues that he was not in direct possession of the hand grenades and other destructive devices that the police seized because he had been barred from going to the house pursuant to the PFA order, and that the Government did not otherwise prove that he was in possession of the devices. The Government counters that there was sufficient evidence at trial for a jury to conclude beyond a reasonable doubt that Introcaso was in constructive possession of the devices. As this is a sufficiency-of-the-evidence issue, we ask "whether there was substantial evidence, viewed in the light most favorable to the government, to support defendant['s] conviction." *United States v. Castro*, 776 F.2d 1118, 1123 (3d Cir. 1985).

In order to convict for possession of unregistered destructive devices, the Government must present sufficient

---

number, and without one it could not be registered. *See* App. 400. Apparently in 1934 and in 1968 there was an amnesty period during which Introcaso (or whoever was alive and in possession of the gun at that time) would not have been prosecuted had he brought in the gun for registration. *Id.* at 400–01. But "at this point in time, there's no provision to register a firearm that's already manufactured, and governed by the [Firearms Act]." *Id.* at 401 (ATF agent's testimony).

evidence to demonstrate that Introcaso was in possession of the devices.  This demonstration may be actual or constructive. *United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993).  To demonstrate constructive possession, the Government

> must submit sufficient evidence to support an inference that the individual "knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons. Constructive possession necessarily requires both 'dominion and control' over an object and knowledge of that object's existence."

*Id.* (quoting *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992) (citations omitted)).  "Such dominion and control need not be exclusive but may be shared with others." *United States v. Davis*, 461 F.2d 1026, 1035 (3d Cir. 1972).  Mere proximity is not enough to demonstrate constructive possession. *United States v. Jenkins*, 90 F.3d 814, 818 (3d Cir. 1996) .

In *Brown*, the Court concluded that the evidence sufficed to support a finding of constructive possession where the defendant possessed a key to the house, came to the house during the search, admitted that non-contraband items found in the same room as the contraband items belonged to her, established that she owned the house, and a Government witness testified that the house was used to store and prepare drugs for

23

distribution. *Brown*, 3 F.3d at 680–81. Similarly here, the Government established that Introcaso was the lessee of record on the house and had occupied the house along with his wife up until a week before the explosive devices were removed, he was seen in the vicinity of the house when police returned for the second search, his wife's keys did not work to open the locked cabinet in which the explosives were found, he likely knew about the devices, as two former employees testified that they had seen him store similar or identical hand grenades in a similar or identical military ammunition box in his office and an ammunition-filled box was in his basement during the search. *See* App. 152–53, 161–63, 182–86, 193–94, 248–50, 298–303, 342–44, 465–66.

Viewing the evidence in the light most favorable to the Government, we have no doubt that it presented evidence sufficient to allow a jury to conclude that Introcaso was in constructive possession of the explosive devices, and there is no indication that its conclusion rested on mere proximity. *Cf. Jackson v. Byrd*, 105 F.3d 145, 148–50 (3d Cir. 1997) (apartment lessee who exercised control over parts of it was in constructive possession of its contents); *United States v. Wahl*, 290 F.3d 370, 376–77 (D.C. Cir. 2002) (jury may infer that a person exercises constructive possession over items found in his or her home).[12]

---

[12] Introcaso also argues that proof of constructive possession requires an affirmative act linking the accused to the contraband

## IV.  Sentence: Reasonableness[13]

Introcaso received a sentence of six months' imprisonment and six months' supervised release on the firearm count (Count I), 46 months' imprisonment and three years' supervised release on the grenades count (Count II), a fine of

---

item.  In support of his argument, he cites *United States v. Moye*, 422 F.3d 207, 212–13 (4th Cir. 2005), erroneously stating that it is a Third Circuit opinion following and elaborating upon *Brown*.  Appellant's Br. at 14.  *Moye* was a Fourth Circuit opinion, and it was vacated by an *en banc* panel last year.  454 F.3d 390 (4th Cir. 2006) (*en banc*).  The *en banc* opinion stated no such "affirmative act" element of constructive possession, and instead reiterated a standard similar to the one we articulated in *Ianelli*: "Constructive possession is established if it is shown 'that the defendant exercised, or had the power to exercise, dominion and control over the item."  *Id.* at 395 (citations omitted).  The Court concluded that the circumstantial evidence in that case sufficed to allow a jury to conclude that the defendant, who never was seen with the gun on his person, was nevertheless in constructive possession of it.  *Id.*  *Moye* thus provides no support for Introcaso's claims.

[13] We review sentences for reasonableness.  *United States v. Booker*, 543 U.S. 220, 261 (2005); *see also United States v. Grier*, 475 F.3d 556, 561 (3d Cir. 2007) (*en banc*). Reasonableness review "merely asks whether the trial court abused its discretion" in imposing a sentence.  *Rita v. United States*, 551 U.S. __, 127 S. Ct. 2456, 2465 (2007).

$2,000, and a special assessment of $200 (reflecting a mandatory assessment of $100 on each count). The sentences were to run concurrently. Though we reverse Introcaso's conviction and vacate his six-month sentence on the first count, we affirm his conviction on the second count. Thus, it is necessary for the Court to determine whether the sentencing court's imposition of a 46-month sentence on the second count was reasonable.

Introcaso's argument that 46 months' imprisonment is an unreasonable sentence is no more than a rehashing of his challenge to the conviction. In challenging the sentence, he merely reiterates that he was not in possession of the destructive devices "secured" in the basement, and that no one intended to "utilize any item in this case for a destructive or otherwise illegal purpose." Appellant's Br. at 17. He argues that these facts "combine to render the sentence imposed unreasonable under the circumstances and therefore same should be reversed." *Id.*

A review of the sentencing hearing reveals that the District Court complied with the three-step sentencing procedure we set out in *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).[14] It performed the initial Guidelines calculation based on

---

[14] We have interpreted *Booker* to require the following three steps in the sentencing process:

the Pre-Sentencing Report, it ruled on Introcaso's downward departure motion, and it exercised discretion in imposing a sentence in the middle of the Guidelines range. *See* Supp. App. 70–85. We discern no abuses of discretion, and thus have no reason to hold the sentence unreasonable.

Finally, though we reverse Introcaso's conviction on Count I and vacate his sentence thereupon, a remand for resentencing is unnecessary because our actions with respect to

---

> (1)    Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

> (2)  In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

> (3)  Finally, they are required to exercise their discretion by considering the relevant [18 U.S.C.] § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*Gunter*, 462 F.3d at 247 (internal citations, brackets, and quotation marks omitted).

27

Count I do not affect his sentence under Count II.[15]   Our

---

[15] The District Court assessed the base offense level to be 18 pursuant to U.S.S.G. § 2K2.1(a)(5) for violation of, *inter alia*, § 5845(a) of the Firearms Act.  It added two points pursuant to § 2K2.1(b)(1)(A), for an offense involving three to seven firearms, on the ground that Introcaso possessed one unregistered shotgun and three hand grenades.  The Court then added another two points for possession of the three hand grenades pursuant to § 2K2.1(b)(3)(B), resulting in a total adjusted offense level of 22. This offense level—combined with a criminal history category of I—corresponds to an imprisonment range of 41 to 51 months, a supervised release range of two to three years, and a fine range of $7,500 to $75,000.

Removing the shotgun count from the sentencing calculation yields the same advisory Guidelines range. The two-point addition under § 2K2.1(b)(1)(A) remains unchanged because the hand grenade count is sufficient to meet the requirements of the Guidelines' provision.  Within the Guidelines range of 41 to 51 months, the District Court determined that a term of imprisonment of 46 months was a proper penalty to address the severity of Introcaso's conviction on the grenades count. *See* Supp. App. 82 ("A lesser sentence than 46 months in my view would not adequately promote respect for the law under [sic] grenade offense, and would depreciate the seriousness of the offense[,] and . . . would not be sufficiently just punishment.").  Finally, the Court imposed a below-Guidelines-range fine of $2,000 because of Introcaso's inability to pay, and the fine remains unaffected by our reversal on the shotgun count.

decision to reverse Introcaso's conviction and vacate his sentence on the first count materially changes his sentence in only one way: he was initially sentenced to a $200 mandatory special assessment, reflecting an assessment of $100 on each count. Because we are vacating the sentence on count one, the mandatory special assessment should be $100, reflecting an assessment on the second count only.

## V.    Conclusion

Concluding that the statute was ambiguous as to whether the antique firearm exception applied to the gun in question, we apply the rule of lenity to reverse Introcaso's conviction on that count. But because the Government's evidence was sufficient to establish that he was in possession of the hand grenades, we affirm the conviction on the second count. While we vacate the portion of Introcaso's sentence relating to count one and affirm the conviction and sentence for count two, there is no need to remand for resentencing because (but for our eliminating a $100 special assessment) his sentence remains the same.

ACKERMAN, <u>District Judge</u>, concurring in part and dissenting in part:

I join the majority's opinion insofar as it affirms Introcaso's conviction on count two, for possession of unregistered destructive devices. I also concur with the majority's conclusion that the sentence imposed on Introcaso was not unreasonable. However, I must respectfully dissent from the majority's decision to reverse Introcaso's conviction as to count one, possession of an unregistered sawed-off shotgun. For the reasons stated by the Second Circuit in *United States v. Tribunella*, 749 F.2d 104 (2d Cir. 1984), I would conclude that the antique-firearm exception does not apply in this case and would affirm Introcaso's conviction on this count.

As the majority suggests, in enacting the National Firearms Act, Congress had several purposes, including not placing undue burdens on museums and gun collectors and decreasing the violent use of guns. *Tribunella*, 749 F.2d at 109-11. However, the mere fact that Congress had multiple and perhaps competing purposes does not automatically render the statute ambiguous. As the court in *Tribunella* reasoned, the Act's restrictive definition of antique "in terms of the type of ammunition the weapon could use reveals that Congress's

overriding concern was for decreasing the violent use of guns." *Id.* at 110. Thus, Congress intended "to exclude from regulation only those weapons that are unlikely to be usable for violent acts." *Id.* Accordingly, there is no need to resort to the rule of lenity: The Second Circuit's reasonable construction of § 5845(g) as "excluding from the definition of antique any firearm for which any usable ammunition is readily available in ordinary channels of commerce," *id.* at 109, comports with the statute's plain text and congressional intent. Therefore, I must respectfully dissent from the majority's opinion regarding Introcaso's conviction for possession of an unregistered firearm.

31